Frank J. KELLEY, Attorney General for the State of Michigan, on behalf of the People of the State of Michigan, Plaintiff,

v.

Earl BUTZ, Secretary, Dept. of Agriculture, U. S. of America, Washington, D. C., et al., Defendants.

No. M–74–87.

United States District Court, W. D. Michigan, N. D.

May 29, 1975.

---

Frank J. Kelley, Atty. Gen., Stewart H. Freeman, Charles Alpert, Robert N. Rosenberg, S. David Kutinsky, Asst. Attys. Gen., Environmental Protection & Natural Resources Div., Lansing, Mich., for plaintiff.

Frank Spies, U. S. Atty., Grand Rapids, Mich., for defendants.

## OPINION

MILES, District Judge.

Plaintiff seeks injunctive relief in order to prevent the United States Forest Service of the Department of Agriculture from spraying by helicopter approximately 84 acres of the Ottawa National Forest in Ontonagon County, Michigan with a mixture of the chemical defoliants 2,4D and 245-T.[1] Upon plaintiff's petition, and in order to preserve the *status quo* pending a more complete hearing, this Court issued a Temporary Restraining Order on August 8, 1974. Hearing was then held on

---

1. The complete chemical names for these compounds are:

2,4D: 2,4–dichlorophenoxyacetic acid.
2,4,5–T; 2,4,5–trichlorophenoxyacetic acid.

plaintiff's motion for a preliminary injunction on August 23 and 24, 1974. In the hearing, plaintiff contended that, as presently constituted, the project violates the National Environmental Policy Act of 1969 [2] (N.E.P.A.) and the Federal Insecticide, Fungicide and Rodenticide Act (F.I.F.R.A.).[3] Plaintiff argued that since this is a project for which an environmental impact statement must be filed under NEPA, failure by defendants to do so violates the Act. Plaintiff further argued that the procedures intended to be used by defendants in spraying violate FIFRA because they are inconsistent with instructions contained on the labels of the above identified herbicides. Defendants moved for dismissal and/or summary judgment, arguing with respect to

FIFRA that plaintiff has no standing to raise this issue, and with respect to NEPA, that this is not a project which requires an environmental impact statement under the Act, and that even if it were, an impact statement entitled "The Use of Herbicides in the Eastern Region" covers the project and fulfills the NEPA requirements. These motions were taken under advisement and the parties proceeded to present a large volume of very enlightening evidence and testimony.

## I. N.E.P.A.

### 1. Overview

Section 102 of NEPA provides the focal point for the issues raised by the parties with respect to this statute.[4]

---

2. 42 U.S.C. Section 4331 et seq.

3. 7 U.S.C. Section 135, et seq., P.L. 92–516.

4. The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall—
(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;
(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the

maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, United States Code and shall accompany the proposal through the existing agency review processes;
(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;
(E) recognize the worldwide and longrange character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;
(F) make available to States, counties, municipalities, institutions, and individuals, ad-

The requirements of this section, which the Courts have interpreted, purport to set a strict standard of compliance that is not inherently flexible. The principle has been outlined in a number of major decisions. See generally, *Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323 (4th Cir. 1972), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261; *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S. App.D.C. 5, 458 F.2d 827 (1972); *Greene County Planning Board v. Federal Power Commission,* 455 F.2d 412 (2d Cir. 1972), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90; *Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission,* 146 U.S. App.D.C. 33, 449 F.2d 1109 (1971).

The Sixth Circuit views NEPA in this light:

"The congressional mandate is clear. Federal officials are to appraise continuously all of their activities not only in terms of strict economic or technological considerations but also with reference to broad environmental concerns. They are to coordinate hitherto separate operations so that undesirable environmental effects may be perceived and minimized. Subject only to the limitation of practicability, they are to strive constantly to improve federal programs to preserve and enhance the environment. In other words, federal officials are required to assume the responsibility that the Congress recognized, in section 101(c) of the NEPA, as the obligation of all citizens: to incorporate the consideration of environmental factors into the decision-making process . . ." *Environmental Defense Fund v. Tennessee Valley Authority,* 468 F.2d 1164, 1174 (6 Cir. 1972).

This circuit has also endorsed the interpretation advanced in the pivotal *Calvert Cliffs',* supra case:

"The statutory requirement of an impact statement 'seeks to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in this fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. Moreover, by compelling a formal "detailed statement" and a description of alternatives NEPA provides evidence that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own.' *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (D.C.Cir. 1971), 17 A.L.R. Fed. 1." *Natural Resources Defense Council v. Tennessee Valley Authority,* 502 F.2d 852, p. 853 (6 Cir. 1974).

### 2. *Scope of Review*

Before turning directly to a consideration of the arguments that have been advanced in this aspect of the case, however, we must first determine the scope of review open to us under these particular circumstances. Specifically before us here, with regard to a potential violation of NEPA, is the decision by a member of the Forest Service (Deputy Forest Supervisor) that an environmental impact statement was not needed for this spray project.

vice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by title II of this Act

Section 701 of the Administrative Procedure Act, 5 U.S.C. § 701, provides for judicial review of the actions of "each authority of the Government of the United States" except where such review is prohibited by statute or "agency action is committed to agency discretion by law." This section has been expansively construed by the Supreme Court and the exceptions have been held only to apply to situations in which there is a "showing of 'clear and convincing evidence' of a . . . legislative intent" restricting review, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed. 2d 681 (1967), or in which the statutes involved are so broadly drawn that in a given situation there is "no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970). Neither of these exceptions apply to the instant case. A review of both the laws establishing the National Forest system [5] and NEPA show that neither seeks to restrict judicial review in the ways mentioned above. At the same time, it is abundantly clear that there is "law to apply" here, thus rendering the "committed to agency discretion" expection inapposite. This Court, therefore, does have the power to undertake consideration of this agency action.

This result does not, however, end our threshold inquiry, for we must also examine the standards under which such review is to be conducted. Again *Overton Park*, supra, is helpful. There, the Court was asked to consider the propriety of a decision by the Department of Transportation to construct a highway through a public park.[6] The Court held that Section 706 of the Administrative Procedure Act, 5 U.S.C. Section 706,[7] provided the necessary guidance. In addition, the Court found that under this statute, the limits of review are circumscribed. The decision at issue normally enjoys a presumption of regularity, and the reviewing Court has no power to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc.*, supra, 401 U.S. at 415–416, 91 S.Ct. 814. Nonetheless, the Court is still to make a "thorough,

---

5. 16 U.S.C. § 471 et seq., 16 U.S.C. § 561 et seq.

6. NEPA was not at issue in Overton Park. Rather, plaintiffs there argued that the decision to build violated § 4(b) of the Department of Transportation Act of 1966 and § 18(a) of the Federal Aid Highway Act of 1968. Just the same, a number of courts have utilized the principles developed in Overton Park in cases involved NEPA. See *Citizens Organized to Defend the Environment, Inc. v. Volpe*, 353 F.Supp. 520 (S.D. Ohio 1972); *Environmental Defense Fund v. T.V.A.*, 371 F.Supp. 1004 (E.D.Tenn. 1973), aff'd, 492 F.2d 466 (6 Cir. 1974); *Daly v. Volpe*, 376 F.Supp. 987 (W.D.Wash. 1974); *Save our Ten Acres v. Kreger*, 472 F.2d 463 (5 Cir. 1973).

7. "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
"(1) compel agency action unlawfully withheld or unreasonably delayed; and
"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
"(B) contrary to constitutional right, power, privilege, or immunity;
"(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
"(D) without observance of procedure required by law;
"(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
"(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
"In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706

probing, in-depth review." (Id. at 415, 91 S.Ct. 814).

■ Based on these authorities, this Court concludes (as did Judge Kinneary) that ". . . the legality, not the wisdom, of the . . . actions is at issue." *Citizens Organized to Defend Environment v. Volpe,* 353 F.Supp. 520, 526 (S.D.Ohio 1972). In this regard, under Section 706 of the Administrative Procedure Act, the reviewing court is provided with the authority to set aside agency actions under certain conditions. Two of those conditions are particularly appropriate here. They are: "(A) arbitrary, capricious, and abuse of discretion, or other not in accordance with law . . .; (d) without observance of procedure required by law." 5 U.S. C. Section 706(2)(A)(D).

Mindful of the limits of our power in this area and guided by the standards set forth above, this Court will approach the merits of this branch of the case.

3. *Balancing Interests*

Plaintiff argues that the proposed spraying action is a "major Federal action significantly affecting the quality of the human environment" for which, under NEPA an environmental impact statement must be made. Defendants' first response is that this project does not fit the statutory description. The factual underpinning for this contention comes from the decision of the Deputy Forest Supervisor for the Ottawa National Forest that this action did not require an impact statement. That

decision is documented in an "Environmental Analysis" prepared during July and August of 1974, and which is reproduced in the Appendix.[8]

The project in question was recommended by the District Ranger of the United States Forest Service who testified that the purpose of the spraying "was to release the pine planted on the earth from being overtopped by various hardwoods and broad leaf species." (T.T. 111).[9]

At the outset, we must bear in mind that, as is frequently the case, the administrator must balance a number of different and potentially conflicting mandates. On the one hand, the Organic Act of 1887, 16 U.S.C. 471, which established the National Forest system, set forth "the furnish[ing of] a continuous supply of timber for the use . . . of citizens of the United States"[10] as one of the reasons for which these lands were to be set aside. At the same time, the equally clear command of NEPA, often accompanied by shrill voices of hysteria, forced the administrator to objectively scrutinize all aspects of proposed actions affecting the environment, including the possibility that the action should not be taken.

This Court is also mindful of the importance attached to relative costs in the balancing of interest process. As considered in *Lee v. Resor,* 348 F.Supp. 389 (1972), the Court stated:

"Another factor which must be considered in balancing the hardships

---

8. At the hearing, this document was admitted as defendants' Exhibit C, and was received for the limited purpose of showing the factors that motivated the Deputy Forest Supervisor's decision not to recommend the drafting of an environmental impact decision for this spray project.

9. "A. The purpose of planting the Red Pine on the area was to get a higher unit of production from the acreage that involved a higher acreage of timber." (TT 111)

Q. Why would one choose to plant Red Pine?
A. We feel the site is much more suited to

Red Pine production than it is to the hardwood production that was on there . . . it's a drier, more air type. It's a sandy, more sandy soil and it will produce red pine to a mature stand much more rapidly than the site would grow hardwood species. It adds diversity to the area . . . reduces the effects that possible disease goes through." (TT 122)

10. 16 U.S.C. § 475. It should not tax the imagination of any informed person to recognize the great importance of reforestation for both this and future generations.

. . . is the economic burden to the people. It costs the Corps $12.00 per acre to spray the hyacinths. Mechanical harvesting, the only present alternative method of removal, now costs $1,600.00 per acre." (at page 393)

In the 84 acres under consideration in this project, the Federal service had but "$100 per acre invested at this time . . . We got about 65 percent of the Red Pines left that were planted" (T.T. 114). Absent treatment, about a 10% per year loss could be expected. In such a difficult situation, constrained as we are by the limits developed in the preceding section, it is incumbent on this Court that it proceed with care and understanding in the assessment of the actions taken by the Forest Service in this matter.

This assignment is aided by regulations that have been issued by both the Council on Environmental Quality [11] and the U.S. Forest Service, [12] which outline the substantive and procedural requirements for both the full impact statement and/or the so-called "negative declaration." Environmental Protection Agency regulations state the following with regard to negative declarations:

"Negative declaration and environmental impact appraisals.

(a) General. When an environmental review indicates no significant impact, a negative declaration shall be prepared prior to taking action (see Exhibit 4). An environmental impact appraisal supporting the negative declaration shall be prepared for those cases specified in the subparts following Subpart D of this part, as determined by the "responsible official." The appraisal (see Exhibit 5) describes the proposed activity and its effects, and documents the reasons for concluding that there will be no significant impact. This appraisal shall remain with internal records for the activity or action, and shall be available for public inspection." 40 C.F.R. § 6.25 (1973).

Exhibit 5, cited above, provides additional insight into what is expected in the negative declaration and the appraisal which is to accompany it:

Exhibit 5

Environmental Impact Appraisal
suggested format

A. Identify Project.
   Name of applicant: _____
   ·Address _____
   Project Number (if assigned) _____

B. Summarize Assessment.
   1. Brief description of project: _____
   2. Probable impact of the project on the environment: _____
   3. Any probable adverse environmental effects which cannot be avoided _____
   4. Alternatives considered with evaluation of each _____

---

11. Under NEPA, the Council on Environmental Quality has the responsibility for reviewing and recommending changes in federal environmental policy. See 42 U.S.C. § 4344.

12. Pursuant to NEPA, these regulations were drafted to comply with the mandate of Section 102(B) of the Act, 42 U.S.C. Section 4332(B).

5.  Relationship between local short-term uses of environment and maintenance and enhancement of long-term productivity: ____

6.  Any irreversible and irretrievable commitment of resources:

7.  Public objections to project, if any, and their resolution:

8.  Agencies consulted about the project: _____
    State representative's name: _____
    Local representative's name: _____
    Other: _____

C.  Reasons for concluding there will be no significant impacts. (Discuss topics 2, 3, 5, 6, and 7 above, and how the alternative (topic 4) selected will avoid any major public objections or significant impacts, thereby making an impact statement unnecessary.)

(Signature of appropriate official)

Date

◆

The U.S. Forest Service has supplemented these regulations with its own set of proposed guidelines governing environmental statements, which provide in pertinent part:

"8411.43 Actions in which the need for environmental statements will be determined through an environmental analysis. Because of the complexity of Forest Service programs, it may not be possible to determine in advance the need for an environmental statement. The responsible official must consider the criteria in FSM 8411 of this chapter and use reasonable judgment. In many cases program statements will be appropriate in order to assess the environmental effects of a number of individual actions in a given geographical area. However, individual actions not adequately covered by a timely program statement may require an individual statement.

In this category an environmental analysis is required as a basis for determining the need for an environmental statement. *The environmental analysis should assess the same areas of environmental impact as would be covered in an environmental statement . . .*

\*   \*   \*   \*   \*   \*

When the environmental analysis does not indicate controversy or a significant environmental impact, the responsible official may decide that an environmental statement is not required. In these situations the responsible official will make a written report setting forth his determination that there will be no significant impact upon the quality of the environment or controversy if the proposed action is undertaken. The written determination may be part of the environmental analysis report or may be a separate document. See FSM 8311.-10." (Emphasis added.) 38 F.R. 31924 [13]

13. Since the hearing in this matter, these guidelines have been published in final form. 39 F.R. 38244 (Oct. 30, 1974), et seq. Pertinent provisions of the final guidelines are substantially the same as those of the proposed guidelines, and read as follows:

4. *The Negative Statement*

The Courts have also had occasion to consider negative environmental declarations. In *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission*, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973), the Court at 1094–1095 stated:

"More importantly, when the agency has decided that a NEPA statement is not yet necessary, it should state the reasons for its decision. The value of such a statement of reasons is becoming generally recognized as courts and agencies grapple with the difficult task of developing procedures for compliance with NEPA . . .

Similarly, the regulations of the Environmental Protection Agency require that agency to issue a negative declaration when an environmental assessment indicates there will be no significant impact, accompanied by an appraisal documenting the agency's reasons for concluding that no statement is required.

A statement of reasons will serve two functions. It will ensure that the agency has given adequate consideration to the problem and that it understood the statutory standard. In addition, it will provide a focal point for judicial review of the agency's decision, giving the court the benefit of the agency's expertise. (Footnote omitted)

See also, *Hanly v. Kleindienst*, 471 F.2d 823 (2 Cir. 1972), cert denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

■ At this stage, an informed comparison of the Environmental Analysis submitted in this case and the standards of adequacy promulgated by the agencies responsible for these statements should be undertaken in order to determine if indeed the Forest Service has followed the "procedure required by law." An examination of the Environmental Analysis shows that there has been substantial compliance with many of the requirements set forth in the regulations. Both the project and spray area are described in pertinent detail, aided by maps. The report indicates that consideration has been given to the potential impact of this action and the long-term changes expected as a result of the spraying. In addition, the consultations conducted with other agencies, both state and federal, are documented in the analysis. There are at the same time, however, some observable omissions in the analysis. When compared to the Forest Service standard requesting that environmental analysis deal with the same topics as impact statements, and the EPA regulations requiring description and evaluation of the alternatives, plus a justification for the alternative finally chosen for this project, the analysis is clearly deficient. First of all, the analysis neglects to deal directly with objections to the project and their resolutions, if any. More importantly, however, the statement undertakes no direct consideration of either the alternatives to this project

---

8411.43—*Actions in which the need for environmental statements will be determined through an environmental analysis.* The responsible official must consider the criteria in FSM 8411 of this chapter and use reasonable judgment. In many cases program statements will be appropriate in order to assess the environmental effects of a number of individual actions in a given geographical area. However, individual major and significant actions not adequately covered by a timely program or land use statement require an individual statement.

An environmental analysis is required as a basis for determining the need for an environmental statement. The environmental analysis should assess the same areas of environmental impact as would be covered in an environmental statement.

\* \* \* \* \*

When the environmental analysis does not indicate high controversy or a significant environmental impact, the responsible official may decide that an environmental statement is not required. In these situations the responsible official will make a written report setting forth his determination. The written determination will be part of the environmental analysis report (See FSM 8311, Item 11). The report and determination will be available to the public for inspection.

or of "how the alternative selected . . . will avoid any major public objections or significant impacts, thereby making an impact statement unnecessary." 40 C.F.R. Section 6.25, Ex. 5, supra. The only significant consideration of alternatives in the entire analysis comes in the following cryptic sentences taken from paragraph number 1 of the letter dated August 6, 1974:

> "1. A discussion of alternative methods of releasing the pine plantation is contained in the Final Environmental Statement entitled "The Use of Herbicides in the Eastern Region . . . This discussion is considered adequate and appropriate for the purposes of your environmental analysis."

The Final Statement mentioned above was part of the evidence admitted at the hearing,[14] and it does indeed mention a number of other ways the objectives of a spray project can be accomplished. See Part V, pp. 64–72. They include the "no action" alternative, the use of different herbicides, the treatment of individual trees with herbicide and the clearing out of undesired trees by hand or mechanical means. These options are dealt with, however, in only the most general terms, with no mention of this or any other particular project.[15] These options are compared in terms of their relative costs per acre and general guidelines are set forth describing the conditions under which a given alternative might be the most desirable.[16] Omitted therefrom, however, from such impact is the application of these criteria *to the 84 acres here in issue.* Nor is there any evidence from the record of en-

vironmental analysis made by the Ottawa National Forest staff that this was ever done.

The District Ranger who recommended the spray project testified as to the reason for spraying in preference to other methods:

> " . . . it was the best way we could get at the 84 acres. In looking at the total job, we could do it much more rapidly and much more cheaply and much more effectively using an herbicide than, say, going in with a crew and individually by hand, cutting the hardwood sprout . . ." (T. T. 113)

The result is that in relying almost totally on an extremely generalized form of environmental impact statement for a consideration of the alternatives to this action, the Forest Service failed to objectively assess each possible alternative in the light of the particular conditions characterizing this individual project. Thus, the active search, envisioned by NEPA and required by EPA regulations for that alternative which best balances project objectives with environmental amenities has been cut short. In a project involving three rather small and separate tracts, such a detailed consideration could have very likely revealed the efficacy of some other method,[17] such as hand spraying or mechanical clearing, for instance.

The Court was well impressed with several of the government's witnesses who brought a rich background of experience in the use of herbicides in question.[18] Nevertheless, witnesses for the

---

14. This impact statement was admitted into evidence for the same limited purpose as environmental analysis was. See Note 8, supra.

15. This fact alone does not invalidate either the impact statement or the consideration of alternatives therein. See 22 below. And while it should be stressed that we do not decide the question at this time, a full reading of the impact statement, however, leads the Court to harbor some doubts as to whether it is adequate under either NEPA or the For-

est Services' own proposed guidelines. See NEPA Section 102(c) and USFS Proposed Guidelines Section 8412.2, 38 F.R. 31925.

16. See also Table 12, page 69.

17. Some of the project has been converted to a non-aerial form of spraying. See Appendix, letter dated Feb. 7, 1974.

18. Dr. Logan A. Norris (TT 216–278), Professor at Oregon State University with a Ph.D. degree in Plant Biochemistry from the institution, an author of more than 50 scientific pub-

plaintiff were formidable in both their credentials and forthright opinions.[19] Dr. Verrett testified at great length concerning the results of studies conducted on chickens and rats. She stated in relation to those studies:

"A. . . . we have had many instances in this country where there have been poisonings by the use of 2,4,5–T, and apparently contamination . . . with dioxin . . ." (T.T. 41)

"A. In the case of 2,4,5–T, we found very definite abnormality associated with it, we found some toxicity . . . . . we saw a reasonably high incidence of defects involving the palate, the cleft palate . . . defects of the eyes . . . . . . . a slippage of the tendon in the ankle joint, such that the legs were twisted . . ." (T.T. 43–44)

". . . What was striking about these samples . . . is that although there were differences in the acute toxicity, there were not real differences in the level of abnormalities . . ." (T.T. 45)

"Q. Based upon your experimental work, could you offer an opinion on the toxicity of dioxin?

A. I can say that of the 800 chemicals that I have tested . . . this includes pesticides . . . I think 50 pesticides, several hundred food additive chemicals . . . dioxin, the tetro-chloro dibenzo-o-dioxin, which is the principal contaminant of 2,4,5–T, is the most toxic material that I have tested . . . (T.T. 47, 48)

In many cases, man is the much more sensitive species. This is particularly true with respect to drugs . . . (T.T. 48)

I think it is not wise to use 2,4,5–T, particularly since it cannot be made without an unavoidable contamination with dioxin . . . (T.T. 49)"

Dr. Westing personally visited the Southeast Asia area upon four occasions, from 1969 to 1973, "and each time I visited areas that were sprayed by 2,4,5–T" (T.T. 76). The purpose of his trip was "to study the impact of 2,4,5–T . . ." (T.T. 76). He conducted his study in the heavily sprayed areas (war zones C & D) collecting:

". . . live fish and shrimp . . out of streams . . . several miles away from where the area was sprayed. . . . and recently these were tested for their dioxin levels, and they did contain several parts per trillion of dioxin. It was detectable dioxin

lications dealing with chemicals used in forestry and a third of them dealing specifically with 2,4,5–T. He has been involved in practical, useful research with that pesticide since 1962.

Dr. Edwin A. Woolson (TT 278–294), an Analytical Chemist dealing with 2,4,5–T and 2,4–D "along with about 16 other pesticides" and is associated with the U.S. Department of Agriculture at Beltsville, Maryland, the Agricultural Environmental Quality Institute, Pesticide Degradation Laboratory.

Captain Alvin L. Young, U.S. Air Force (TT 294–315), presently an Associate Professor of Life Sciences, Department of Life and Behavioral Sciences, United States Air Force Academy, who has his Ph.D. degree in Herbicide Physiology. He has a rich background in evaluating the ecological effects of military herbicides.

The Court takes great comfort in the awareness of their association with government after hearing and observing these outstanding scholars who have implemented academia by sound practical research and relevant experience.

19. Dr. Jacqueline Verrett, who is a sixteen-year veteran employee of the Food and Drug Administration, as a Research Scientist and who has been involved in testing chemicals for toxicity for the last thirteen years.

Dr. Arthur Westing (TT 74–98), a Doctor of Philosophy graduate from Yale University in Plant Physiology and a former employee of the U.S. Forest Service, on the teaching staffs at Massachusetts and Purdue, now Chairman of the Biology Department at Windham College (Vt.).

by methods that our Commission developed." (T.T. 78, 79)

.    .    .    .    .    .

The study continued to,

"hospital records in sprayed and in unsprayed areas, and we found that the rate of birth defects in these unsprayed areas' hospitals went up during the period of heavy spraying." (T.T. 82)

Dr. Westing's conclusion is as follows:

"I would certainly have no objection to the use of herbicides in general, to doing work in forests, I mean, forestry approved work, but certainly I would not recommend 2,4,5–T. I would never recommend 2,4,5–T on the basis of present knowledge because there is no way to make 2,4,5–T without dioxin, and our own studies have shown that this dioxin can get from one place where it's sprayed, several miles away, into the food of people, even several months after it's sprayed, and dioxin is in the 2,4,5–T, and therefore I would certainly not recommend the use of 2,4,5–T.[20]

Although the government produced outstanding witnesses in rebuttal, the testimony of the above quoted persons prompts this Court to the same concern as that registered by Judge Wade McCree in *Environmental Defense Fund v. Tenn. Valley Auth.*, 468 F.2d 1164, 1173 (1972) as follows:

The NEPA represents the first comprehensive congressional response to the environmental concerns that surfaced so dramatically during the 1960's. As the Senate Committee observed, "[t]he inadequacy of present knowledge, policies, and institutions is reflected in our Nation's history, in our national attitudes, and in our contemporary life. . . . We no longer have the margins for error that we once enjoyed. The ultimate issue posed by shortsighted, conflicting, and often selfish demands and pressures upon the finite resources of the earth are [sic] clear." S.Rep.No.91–296, 91st Cong., 1st Sess. 4 (1969). Consequently, the NEPA was designed "to assure that all Federal agencies plan and work toward meeting the challenge of a better environment." S.Rep.No.91–296, *supra*, at 9, quoted in Named Individual Members of *San Antonio Conservation Society v. Texas Highway Department*, 400 U.S. 968, 975, 91 S.Ct. 368, 27 L.Ed.2d 388 (1970) (Douglas, J., dissenting), denying cert. before judgment in 446 F. 2d 1013 (5th Cir. 1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972).

■ For these reasons, the Court is therefore forced to conclude that the methods utilized by the Forest Service in arriving at the decision not to make an environmental impact statement for this project were "without observance of procedure required by law" and "not in accordance with law" within the meaning of the Administrative Procedure Act. This, of course, does not mean that an impact statement must now be written for this project. A revised negative statement may be fully sufficient. We only intend to assure that the Forest Service makes the full and unbiased assessment of the environmental ramifications of this project that is required by law.[21]

20. Mr. Jerry Sutherland, District Ranger of the U.S. Forest Service in the Watersmeet area, testified that the Ottawa National Forest is used for both timber production "and for improving wild life habitat." (TT 110)

21. Contemporaneous with the filing of this case, another very similar litigation was underway in the United States District Court, Eastern District of Wisc. Styled *State of Wisconsin v. Butz*, 389 F.Supp. 1065, that case also involved an attempt to enjoin the Forest Service from spraying combinations of 2,4,D and 2,4,5–T on portions of national forest areas. Specifically targeted there were 1,108 acres of the Chequamegon National Forest and 641 acres of the Nicolet National Forest. As in the instant case, plaintiffs in *Wisconsin v. Butz* alleged that the project at issue was a "major federal action" requiring

### 5. The Single-General Impact Statement

■ Defendants advance a second and alternative position. They contend that even if this is indeed a project requiring an impact statement, the statutory requirement has been met through the publication of "The Use of Herbicides in the Eastern Region," final environmental statement referred to hereinabove. For the reasons set forth below, the Court is unable to agree.

The "Eastern Region" impact statement is an extremely broad-based one covering policies and procedures for use of chemical herbicides in the national forest lands in a 20-state region, and as mentioned, it described no specific projects using herbicides. While such a format is not generally faulted,[22] the CEQ has set forth a number of considerations which should guide one's approach to such a statement.[23] Among them is the notion that all actions taken under the auspices of the general statement be properly described and analyzed, either in the statement itself or elsewhere.[24]

■ The same position is reflected in proposed Forest Service regulations governing the composition and issuance of impact statements. Section 8411.44 therein deals with general impact statements and lists three kinds of statements.[25] Two of them are rather clearly

an environmental impact statement under NEPA § 102, and the Forest Service responded that its "environmental analysis report" concluding that no impact statement was necessary constituted compliance.

Judge Reynolds, in his Findings of Facts and Conclusions of Law dated March 5, 1975, found that the project did require an environmental impact statement and enjoined the Forest Service from further work pending compliance with § 102 of NEPA. Since this holding, both parties herein have submitted briefing on the precedential value of *Wisconsin v. Butz* in the instant case. Defendant Forest Service attempts to distinguish the case on a number of grounds, while plaintiff State of Michigan believes the case is a "compelling precedent."

Although the scale of the project in the *Wisconsin* case is "more likely to bring it within the definition of a 'major project' as the United States asserts (Supplementary Memorandum p. 2), the case nonetheless bears many similarities to the one before us now. The basic factual background, and the allegations made by both sides are almost identical to those of this case. We thus hesitate to make light of its holding. By the same token, the case involves a project in a different area which has its own unique set of environmental considerations. As a result, while we view Judge Reynolds' decision with keen interest, particularly his comments upon "environmental analysis reports" therein, we do not consider the decision to be a binding precedent upon this Court.

22. Indeed, if properly done, such a format is encouraged. See Recommendations for Improving Agency NEPA Procedures, page 1, May 16, 1972, 102 Monitor Vol. 2, No. 5, Page 1, June 1972.

23. See *Natural Resources Defense Council, Inc. v. T.V.A.*, 367 F.Supp. 122, 126–127 (D.C.Tenn.1973), aff'd, 502 F.2d 852 (6 Cir. 1974).

24. Id.

25. *8411.44 Program type statements.* A programmatic approach has the advantage of better permitting the analysis of cumulative effects or possible synergistic effects of a series or group of actions. It often has the further advantage of economy in meeting NEPA requirements. The disadvantage may be lack of specificity.

There are different approaches to program statements. Judgment must be used in the selection of the approach. The statement should clearly describe which approach is being used, why it is being used, and what additional follow-up analyses are required, if any.

*Generic statement.* This could be prepared for an activity which is frequently repeated but the "environmental setting" remains either the same or has no significance. A generic statement can be used as supporting record for another statement. A statement on a new "pesticide" is an example of this type.

*Umbrella statement*—(open-ended statement). This is a statement for a broad continuing program operation over a period of time. It helps to focus on the scope and direction of a program. It need not detail impacts of all specific actions, but should indicate the nature and magnitude of these actions. Major actions involved in the statement should be discussed in more detail.

inapposite to our situation. The "generic statement" appears to be aimed more at an assessment of a method of operation than at a given action or series of actions. The "program statement" required that "each component be explicitly described as to environmental setting, scope and time, and impact. Clearly, the "Eastern Region" statement does not fit this mold either. The category most likely to fit the statement before us is that of the "umbrella statement." This type of statement need not detail each action covered by its provisions, but at the same time every action involved in the statement must undergo the NEPA procedure, culminating either in an environmental analysis or an impact statement. That has not been accomplished here. Therefore, on the basis of these considerations, the Court is, at this time, unable to conclude that this proposed spraying is covered in the "Eastern Region" environmental impact statement with sufficient specificity to warrant a holding that there has been compliance with NEPA.

The Court is fully aware of the approval of the single impact statement by the Sixth Circuit Court of Appeals in *Natural Resources Defense Council v. T.V.A.*, 502 F.2d 852. It should be noted that the *per curiam* contained this observation:

"  .   .   .   we hold that the TVA's environmental impact statement comports with the requirements of the NEPA for the reasons set forth in Judge Taylor's two opinions, supra." (p. 854)

Judge Taylor's two excellent opinions set forth in 367 F.Supp. 122 and 367 F.Supp. 128, presented some very cogent reasons for upholding the single

impact statement under the fact situation therein, including: (a) the project was well underway prior to the effective date of NEPA; (b) the problem of conflict with existing TVA regulation was such that it could not be solved; (c) the impact statement related to a localized area (TVA) and not to a third or more of the geographic area of the nation. Further, as observed by Judge Flannery in *Natural Resources Defense Council v. Morton*, 388 F.Supp. 829 (D.C.1974):

"Moreover, in *Natural Resources Defense Council v. TVA*, supra, the plaintiffs sought to compel the agency to file statements for each long term coal contract. The entire operation of numerous generating facilities was dependent on securing coal supplies, and prices in the coal market fluctuated greatly. Delay caused by the preparation of impact statements, normally six months to a year, would have limited seriously the number of coal companies which would bid on TVA term coal contracts. 367 F.Supp. at 125–26." 388 F.Supp. at 838.

Returning again to *Natural Resources Defense Council v. TVA*, supra, one last important factor distinguishes the case at bar from the coal contract situation. The mandatory TVA contract provision required mining companies to submit a pre-mining report prior to the time TVA awarded its contracts. Each report considered environmental problems such as acids, slides, erosion and esthetics involved in the particular area to supply the coal under the contract. 367 F.Supp. at 127–28. Such reports appear to deal in a most particularized and detailed manner with the environmental

Subsequent actions will be covered by environmental analysis or, in some cases supplemental environmental statements may be issued. (Example: Environmental program for the future.)

*Program statement.* This type program statement assesses the impacts of a group of specific projects. Each component must

be explicitly described as to the environmental setting, scope and time, and impact. Time and a number of projects and activities will be fixed. Environmental analyses will have been completed for individual components and integrated into an analysis for the entire program. (Example: Gypsy moth environmental statement.)

factors specifically related to the area to be mined." 388 F.Supp. 839.

This Court considers the fact situation in this case in many respects comparable to that in *N.R.D.C. v. Morton*, supra and approves Judge Flannery's analysis:

"The Court is convinced that the BLM programmatic statement alone, unrelated to individual geographic conditions, does not permit the 'finely tuned and "systematic" balancing analysis' mandate by NEPA. See *Calvert Cliffs' Coordinating Committee v. AEC*, supra 449 F.2d at 1113." 388 F.Supp. 840.

## II. FIFRA

Plaintiff's second count is that the proposed spraying will violate the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. Section 135 et seq. because the procedures planned by the Forest Service do not follow the instructions printed on the labels of the herbicides, 7 U.S.C. Section 136j(a)(2)(G).[26]

Defendants counter with the contention that plaintiff has no standing to raise this issue, citing a series of recent cases as support for this proposition. *People for Environmental Progress v. Liesz*, 373 F.Supp. 589 (D.C.Cal.1974); *Lee v. Callaway* (M.D.Fla.No.72–382 Civ–J–S, Decided June 4, 1974).

If plaintiff has standing under this Act, this Court has jurisdiction to entertain his suit under FIFRA. The Act provides:

"The district courts of the United States are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of, this subchapter."

Turning then to defendants' standing argument, every one of the cases cited by defendant involves a denial of standing under FIFRA to a group of private citizens. That, however, is not the situation confronting us here. The instant case was initiated by a state Attorney General suing "on behalf of the People of the State of Michigan." While the Court is convinced from its review of the authorities that there are significant manifestations of a legislative intent to exclude suits by private citizens under the statute (*People for Environmental Progress*, supra at 592), we find no similar expression of limitations with respect to suits by a sovereign state acting in furtherance of its legitimate interests and on behalf of its entire citizenry.

■ It seems settled that a suit such as this is well within the prerogative of the Michigan Attorney General. Among his powers is his authority to:

" . . . appear for the people of this state in any other court or tribunal, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested."

M.C.L.A. Section 14.28, M.S.A. Section 3.181

On the federal side of this question, the Supreme Court has held that if those bringing suit are within the class of persons which the statutory provision in issue was designed to protect, no specific statutory provision is necessary to confer standing. *Hardin v. Kentucky Utilities Co.*, 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1967). Beyond this is the provision of Section 10 of the Administrative Procedure Act stating that:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. Section 702

■ This has been interpreted to extend standing to those claimants who

---

26. It shall be unlawful for any person— (G) to use any registered pesticide in a manner inconsistent with its labeling;

have an interest "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed. 2d 184 (1969). Moreover, the interest involved need not be economic in nature. It may also reflect "asthetic, conservational, and recreational" values as well. Id. at 154, 90 S.Ct. 827; *Scenic Hudson Preservation Conf. v. FPC,* 354 F.2d 608, 616 (2 Cir. 1965). Thus, the people of the State of Michigan are within the class of persons protected by FIFRA, and that the preservation of themselves and their property [27] from the effects of this type of proposed spraying is within the "zone of interests" sought to be protected by a statute which, through federal regulation, seeks to protect the people of the United States from exposure to a class of potentially toxic agricultural chemicals. At the same time, the facts set out in the pleadings and brought forth in the hearing satisfy the Court that plaintiff here meets the tests for standing enumerated in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1971).

■■■ We therefore conclude that the Attorney General of the State of Michigan, acting for all the citizens of that state, has standing under FIFRA to petition this Court to restrain the defendants herein from violating that statute. The Court denies the objections made by defendant on this issue in the course of the hearing.

A review of the pleadings filed herein, along with the evidence and testimony adduced at the hearing, has revealed to the Court virtually nothing raised by either party reaching the substantive merits of this issue. While this issue was mentioned by counsel in argument at the hearing, and the label for the herbicide to be used here was entered into evidence, the Court can find vir-

tually no testimony which would link the procedures proposed by the Forest Service to violations of the instructions contained on the herbicide label. Under these circumstances, the Court considers it impossible to properly decide whether or not plaintiff is deserving of injunctive relief on this ground, and therefore will not do so.

### III. CONCLUSIONS

■■■ Defendants could complain that this Court has not rendered a finding with respect to irreparable harm normally required for the issuance of preliminary injunctive relief. The Court, however, concludes that *Environmental Defense Fund v. T.V.A.,* supra, is dispositive of this point. Therein at 1183–1184, the Sixth Circuit stated with respect to preliminary injunctive relief in environmental cases that:

"More important, appellants misconceive the purpose of a preliminary injunction in this context. As the court stated in *Scherr v. Volpe,* 336 F.Supp. 882, 886 (W.D.Wis.1971):

the continuing construction work by defendants and those working in concert with them, if allowed to continue, will make it impossible to restore the area in question to its previous environmental status. Thus, plaintiffs' rights would be sacrificed before a complete hearing and determination on the merits of their contention. The purpose of granting the preliminary injunction is to preserve the subject matter of this controversy in its existing condition.

. . . Accordingly, 'unless the plaintiffs receive now whatever relief they are entitled to, there is danger that it will be of little or no value to them or to anyone else when finally obtained.' *Lathan v. Volpe,* 455 F.2d 1111, 1117 (9th Cir. 1971)."

---

27. Evidence adduced at the hearing indicates that there is private property immediately adjacent to one of the spray areas and that within a few miles of this area are the Middle Branch of the Ontonagan River and the Bond Falls Flowage, a large lake.

Accordingly, this Court overrules defendants' objections with regard to FIFRA, denies defendants' motion for dismissal and/or summary judgment, and concludes that plaintiff is entitled to preliminary injunctive relief restraining defendants from undertaking the proposed project until such time as environmental analysis for this project complies with the requirements of the National Environmental Policy Act of 1969.

Environmental Analysis
F.Y. 1975 Aerial Spray Program

## I. Description

The proposal consists of 104 acres in three closely spaced units (see map) which will be sprayed with a helicopter, utilizing a micro foil boom. The object of the water based 2-4-5-T spray application is to release a red pine plantation from overtopping shrubs, aspen and hardwood sprouts. 50% of this red pine is presently overtopped and shaded by vigorous hardwoods and shrubs. The present pine stocking in this plantation is approximately 65%.

The soils in the project area are of the Iron River-Goodman-Baraga Association.

No live streams are located in the project area.
The topography of the project area is flat to rolling.

## II. Environmental Impacts - See below

## III. Favorable Environmental Impacts

On the ground observation shows that pine survival and growth are directly related to overstory removal. Overtopped and open grown pine differ in height by as much as 4-5 feet (1.3' vs 6')

## IV. Unfavorable Environmental Impacts

Some persistent pesticide residues will remain in the soil for several years. Crumrine's tests from previous aerial spray areas showed this increase not dangerous to aquatic life in streams or ponds draining sprayed areas.

The dead hardwood sprouts will be evident to local traffic on the Agate road, but 1 chain no spray strip will be left between the road and the spray pattern.
This strip will remain green and will be left to grow into a pine hardwood mixture - (accepting whatever pine survives as a bonus)

## VI. Short term use vs Long term productivity - the long term productivity of this site to produce timber will increase.

## VII. Irretrievable or Irrevocable Commitments of Resources - None.

## VIII. Consultation - (1) Marion True ground checked the prescription.

Page 2

IX. Management Constraints

(1)  A 1 chain strip will be left along all private land boundaries and along the road on the East side of Unit III, to avoid spray drift problems.

(2)  A three acre patch of large oak (underplanted to pine) will be left as a mast production area and no spray will be applied. (Unit III)

(3)  The private landowner to the South of Unit I and III will be contacted concerning the spray project.  No problems are anticipated as he has been contacted in the past concerning roller chopping and planting phases of management.

Unit-1 - 17 acres
Unit 2 - 44 acres
Unit 3 - 43 acres
Total - 104 acres

Watersmeet District
Ottawa N.F.
Aerial Spray Map

Comp. 1
Section 20 & 29
T 47N R 38W

944

REPLY TO: 2470  Silvicultural Practices                    February 7, 1974

SUBJECT: FY 75 Aerial Spray Environmental Analysis

TO: District Ranger -- Watersmeet

Your E.A. is approved for aerial release. The only change is for about 20 acres of seen area west of the N-S Agate Falls Road. It will be hand sprayed by District crews.

The chemical for both jobs will be a 50/50 mixture of 2,4-D and 2,4,5-T. Spray dates for the two should coincide.

Michael A. Barton

MICHAEL A. BARTON
Deputy Forest Supervisor

cc:  True

MGTrue:gae

Ottawa National Forest
Ironwood, Michigan 49938

8310 Environmental Analysis Reports                 August 6, 1974
(6320)(2470)/

Aerial Spray FY 1975 - EAR

District Ranger - Watersmeet

In light of the recent questions regarding your aerial spray project, we have re-examined the project. The following points are reaffirmed:

1. A discussion of alternative methods of releasing the pine plantation is contained in the Final Environmental Statement entitled "The Use of Herbicides in the Eastern Region." This document was filed with the Council of Environmental Quality and made available to the public on October 30, 1973. The Draft Environmental Statement was filed with the Council of Environmental Quality and made available for public review and comment on July 18, 1972. This discussion of alternatives

in the Final Environmental Statement is considered adequate
and appropriate for the purposes of your environmental analysis.

2. Because this specific project is being conducted
within the purview of this Final Environmental Statement and
because this Final Environmental Statement was subject to public
review throughout the Region and because we have used the aerial
spray technique for several years without significant adverse
criticism and because the Final Environmental Statement addresses
the questions currently being raised with regard to this specific
project. it is my opinion that no Environmental Impact Statement
for this specific project is required.

3. Signs will be posted along the perimeter of the spray
area to inform any visitors of the project for 30 days.

4. The unsprayed strip along private lands will be expanded
from 1 chain to 100 feet.

5. The subject of contaminants in the chemical to be
applied has been adequately discussed in the Final Environmental
Statement referenced above. In addition, Thompson-Hayward's
letter if 8/1/74 states that the dioxin concentration contained
in the herbicide we plan to use is below the detection limit
of .1 ppm of their analytical method.

6. We have received opinions of the HO Chemical Use
Committee, Mr. Hal Bunting of Thompson-Hayward, and Mr. Mountfort
(Section Head, Fungicide and Herbicide Branch in EPA) that our
use of Ded-Weed LV-33 Brush-Kil (Lot C-21118) is consistent
with the label and registered uses of the product.

7. Our discussions with the Environmental Review Board
resulted in no new evidence regarding the effect of the herbicides
being presented to us. The concern of the Attorney General's
office centers around:

1. 1. The application to surface waters.

2. The lack of a specific reference to timberlands
or conifer release on the label.

3. His opinion that an Environmental Impact Statement
is needed.

The EAR as well as the EIS and the Regional Controls and Guidelin-
es indicate that application will not be made to surface waters.

We have been assured that our use is consistent with the regis-
tration and label. See #6 above.

I believe that this 84-acre project is not the question being
raised by the Attorney General's office. The use of 2,4,5-T
is. The use of 2,4,5-T was put before the public in accordance
with National Environmental Policy Act in the Draft(filed

July 18, 1972) and Final (filed October 30, 1973) Environmental Impact Statement entitled "The Use of Herbicides in the Eastern Region."

8. The project will be conducted within the guidelines prescribed in the Final Environmental Statement.

9. Therefore, I concur that no Environmental Impact Statement is required. The proper use of this chemical poses no significant environmental threat. The controversial aspects have been reviewed in an Environmental Impact Statement.

MICHAEL A. BARTON
Deputy Forest Supervisor

CC. RO-TM
    Planning Group
    Vinoski
MABarton:nl