Jose G. **GONZALEZ**, Plaintiff,

v.

**VIRGINIA–CAROLINA CHEMICAL COMPANY**, Defendant.

**No. AC/874.**

United States District Court
E. D. South Carolina,
Columbia Division.

March 4, 1965.
On Motion for Amendment of Judgment
April 7, 1965.

John C. West (Murchison & West), Camden, Dan F. Laney, Jr., Bishopville, Jack L. Marshall, Camden, S. C., for plaintiff.

Douglas McKay, Jr. (McKay, McKay, Black & Walker), James W. Alford, Columbia, S. C., for defendant.

WYCHE, District Judge (sitting by designation).

This is an action for damages arising out of an airplane crash on August 29, 1961. The plaintiff, a young pre-medical student, and a qualified airplane pilot, was employed in South Carolina, as a crop duster, and was applying a chemical dust-defoliant by the trade-name of Folex manufactured by the defendant, by airplane to cotton plants in Lee County, South Carolina, when he alleges he was overcome by the toxic ingredients of the dust-defoliant and caused to crash and suffered severe personal injuries.

The case was tried by me without a jury.

In compliance with Rule 52(a), Rules of Civil Procedure, I find the facts specially and state my conclusions of law thereon, in the above cause, as follows:

## FINDINGS OF FACT

The plaintiff Jose G. Gonzalez is a twenty-eight year old Mexican citizen, a commercial pilot and a pre-medical student. He had a diploma from an approved dusting school, two years' dusting experience, a pilot's permit for South

Carolina, about one hundred hours flying time in a Piper J3, 85 horsepower engine airplane, the type airplane he was flying on this occasion, and a current medical certificate.

Plaintiff was working as a crop duster in South Carolina, on August 29, 1961.

The defendant manufactures a product named "5% Folex Dust" for use as a plant defoliant and its ingredients as set out on the label are as follows: Active Ingredients: Tributyl Phosphorotri-thioite- 4.75% Related compounds- 0.25% Inert ingredients- 95.0%. This material is packaged in fifty (50) pound bags and on the bags are labels which state: "CAUTION Avoid inhalation of dust and contact with skin, eyes, and clothing. Wash thoroughly with soap and water after handling and before eating or smoking. In case of contact with skin or eyes, get medical attention. Wear clean clothing, avoid contamination of feed and foodstuffs."

There was no skull and crossbones on the Folex container or label and the word "poison" (IN RED) was not on the container or label. There was no antidote on the container or label. Folex has a very unpleasant odor.

Plaintiff had been applying Folex for three to four days prior to the accident, and had followed general safety procedures, making daily clothing changes, wearing thick cotton pants, a long-sleeved jacket and a helmet. As an added safety precaution, plaintiff had sketched the field which he was to dust and had noted all possible obstructions. His sketch was introduced in evidence.

On the day of the accident, the boy who had been loading the airplane for plaintiff, was sick, so the plaintiff loaded the airplane with six bags, totalling three hundred pounds, of Folex, by dumping it into the hopper of the airplane. He left the airplane running at idling speed while loading it so any dust would be blown behind him. Plaintiff had made two trips prior to the trip when he crashed.

The hopper on the airplane was made out of plywood and was located in the center of gravity in the airplane fuselage and had a lid on top just behind the wing; underneath was an opening which could be controlled from the cockpit of the plane for delivery of the dust. There was an agitator inside to control the even flow of the dust.

The weather conditions for flying were good on August 29, 1961.

Plaintiff took off on the third trip on August 29, 1961, and flew directly to the field and circled around it to check obstructions and saw the high tension wires and the small wires going to the house, the trees and fences, as shown on his sketch, and started down to make his first "swath run" (when he goes down close to the cotton to deliver the dust, from the moment he opens the hopper to deliver the dust to the time he closes the hopper to make another turn, is called a "swath run"), when he became nauseated from the odor of the Folex, had trouble breathing, had severe pain in his stomach, black spots before his eyes and was sluggish, so he decided to pull up and go back to the airport but it was too late by the time he could make the decision, and he hit a wire on the way up. Nauseated, pain in his stomach, difficult breathing, sluggish and black spots before his eyes, he was incapable of making a quick decision and was incapable of pulling up earlier. He was going about seventy miles an hour when the airplane hit the wire, slowing it down to stalling speed fifteen feet above ground, and it went down nose first, hit the ground, flipped on its back and the Folex hopper burst open throwing the dust all over the plaintiff. After the crash plaintiff was hanging upside down in the airplane, being fastened by a harness and a belt.

As soon as he could, plaintiff freed himself an dragged himself to the wing-tip of the airplane and awaited help. He was having trouble breathing, chills, pain in his stomach, blindness and was vomiting. Plaintiff was taken to the hospital in an ambulance.

Upon arrival at the hospital, plaintiff's face, neck and chest were covered with a fine dusty powder; the plaintiff was con-

scious but bleeding from lacerations of the mouth, lips and chin; his two front teeth were broken; there were deep, dirty, ragged lacerations of the left knee and two on the left lower leg; there was marked shortening of the left leg with deformity of the upper leg due to a fracture of the left femur and marked swelling; he had a broken left ankle, a puncture wound on his right kneecap, his right hand and ankle were hurt; his heart and lungs were normal; his abdomen was flat and not tender, no masses; clear urine was obtained from his bladder. An open reduction and internal fixation with an intramedullary rod on the left leg was scheduled for that afternoon, but the operation could not be performed because the plaintiff's condition was one of rapid deterioration, his blood pressure fell to nothing, his pulse became barely palpable, he started vomiting copiously and was in great pain and complained of considerable headache. Plaintiff had awful pain in his stomach which he described as being like a "ball of fire" in it. Intravenous fluid, whole blood transfusions, Cortef and other supportive measures were administered the plaintiff but none seemed to alleviate or improve the shock the plaintiff was exhibiting.

The doctor identified the powdery substance which the plaintiff had been using and which the doctor had found on the plaintiff when he was admitted to the hospital, as Merphos or Folex-Tributyl Phosphorotrithioite, by a label taken from one of the bags which was brought to him upon his request.

The doctor first checked the books in the medical library of the hospital on poisons but found no record of Folex. He then called the Columbia Poisons Center but they were not able to give any satisfactory help with respect to an antidote. He consulted other doctors in the immediate area and they had no knowledge of this defoliant. Subsequently, he called an official of the defendant company at Richmond, Virginia, and informed him of the emergency situation and asked for a specific antidote, if any was known. The official of the defendant company was unable to give any information as to an antidote and said that he would like for the doctor to talk to the company's toxicologists or chemist, but that he was not immediately available, and referred the doctor to the Duke Poison Control Center in Durham, North Carolina. The doctor then telephoned the Duke Poison Center in Durham, but they had no knowledge of an antidote for Folex. After making more calls, he finally called the Lee County Farm Agent who contacted a toxicologist or chemist at Clemson College, South Carolina, who suggested the use of Atropine. This information was received some twelve hours after plaintiff's admission to the hospital. The earlier an antidote can be administered the more effective it is. The first dose of Atropine was administered to the plaintiff at 10:25 p. m., on August 29, 1961, and the plaintiff had some immediate improvement. The Atropine was repeated on several occasions. Plaintiff's general condition improved considerably and his shock-state improved, but the following day he went back into a state of shock. An electrocardiogram showed definite abnormalities. Atropine was again administered and he improved. Plaintiff's shock was finally relieved after three or four days. On the day of admission to the hospital, plaintiff was started on Crystodigen and was given a total dose of 1.2 milligrams, which was a proper dose for a person in plaintiff's condition, and would not have precipitated such symptoms as nausea.

Folex, the poisonous substance, with which plaintiff had come in contact added to the effects of the trauma producing the shock which plaintiff suffered.

Plaintiff developed strange pustular blebs (blisters filled with pus) over his left lower-upper leg and hip and left lower abdomen. This also delayed surgery.

Not being able to operate, a pin was finally put through plaintiff's leg for traction and skeletal traction was employed. However, the open reduction and internal fixation with an intramedullary rod was done on October 20, 1961, after it was determined that the results from the

skeletal traction system were not satisfactory.

Better results from the operation on the plaintiff's leg would have been obtained had the operation been performed on the date of the accident instead of some six weeks afterwards. Plaintiff's left leg is now approximately one and one-half inches shorter than his right leg, he suffers a weakness in his left leg and it is hard for him to stand for more than three or four hours without pain and weakness, and he has been advised that most likely he will have to have an operation to have the pin removed in his left femur and physiotherapy on his left leg to rehabilitate it. Plaintiff suffers with his back, his vertebral column is curbed due to his shortened leg and he requires special shoes; he limps, even though he has the built-up heel on the shoe on his left foot. His right hand is deformed because of the damage to the ligaments. Two of his front teeth are broken.

Plaintiff remained in the hospital from August 29, 1961, until November 17, 1961. His hospital bill was in the amount of Fifteen Hundred, Ninety Six and 75/100 ($1,596.75) Dollars; his doctors' bills to the date of trial amounted to Thirteen Hundred, Seventy Eight and 00/100 ($1,378.00) Dollars. Plaintiff lost the remaining earnings that he would have anticipated during the crop dusting season in the year he was injured of approximately Nine Hundred ($900.00) Dollars. He was paid on a commission basis and made from $250 to $300 a week. He has not been able to return to crop dusting because he lost his nerve when he had the accident. He was not able to return to work until June, 1962. He worked as a cook but had to give up this work because he was not able to stand on account of the pain and weakness in his leg. He returned to school in the fall of 1962.

It was proved by a chemist in chemical engineering that Tributyl Phosphorotrithioite is neither a phosphate nor a phosphite but a thiophosphite; that phosphate is slightly more toxic than phosphite but the thiophosphates are more toxic; that organic phosphorus compounds are considered highly toxic; that Folex or Merphos with an acute Dermal LD 50 would have a lethal dosage orally of about 1/6 of a pound for a man the weight of the plaintiff and about five times that much or 400 grams if taken dermally; these organic phosphorus compounds can be absorbed into the body where they will react on the nerves and they may be taken into the body through the eye and respiratory system in addition to the mouth; the quickest way for the body to absorb these poisons is through the eye; there is a very fast reaction and much less is required than if taken by inhalation or by the lungs; to incapacitate a person it would take less than 1/100th of the lethal dosage; a person can absorb the phosphorus compounds, and day after day absorb more to build up a cumulative amount in the body; these amounts would not be noticeable but still one could have adverse effects; the last day's dosage would not have to be as great as the dosage on the earlier days; the inhalation of and exposure by the plaintiff to defendant's Folex dust caused plaintiff to crash; plaintiff's symptoms presented "a typical case of cholinesterase inhibition".

One of defendant's witnesses, an employee of the defendant, had worked on the dust to determine its usefulness for cotton defoliation but had not worked on it to determine its toxicity; it was his opinion that the defoliant was an organic phosphorus compound and that organic phosphorus compounds are toxic; he did not know if there was anyone with the defendant company who could give information concerning an antidote for Folex; that defendant had not done any experimenting or taken any precautionary measures in determining whether or not inhaling the dust over a long period of time would be harmful to a man; at the time of the accident Folex had only been on the market in South Carolina, for about one month.

The original caution label on the Folex dust as filed with the Department of Agriculture by the defendant was as fol-

lows: "Avoid prolonged or repeated inhalation of dust and contact with skin. * * *" The words "prolonged or repeated" were lined out and at the end of the sentence was added "eyes, and clothing", so that the caution label read "Avoid inhalation of dust and contact with skin, eyes, and clothing". This change was initialed by a former employee of the defendant.

After a careful consideration of all the evidence, oral arguments and briefs of counsel for the parties, it is my opinion that the negligence of the defendant was the proximate cause of plaintiff's injuries and damages and that he is entitled to recover actual damages against the defendant in the sum of FORTY THOUSAND ($40,000.00) DOLLARS.

## CONCLUSIONS OF LAW AND OPINION

■ The facts in this case, in my opinion, prove that the plaintiff, a well trained, skillful and careful pilot had inhaled and been exposed so thoroughly to the defoliant Folex that he was sickened, nauseated and caused to lose his ability to react to the stresses of the dangers of crop dusting flying, and that the inhalation and exposure of the plaintiff to Folex contributed as a proximate cause to the accident.

■ The defendant was negligent *per se* in that it failed to obey the requirements of the applicable Federal Statute, 7 U.S.C.A. §§ 135–135k, and the South Carolina Economic Poison Law, Section 3–151 through 3–176, Code of Laws of South Carolina, 1962.

7 U.S.C.A. § 135(z) (2) (h), provides that an economic poison is misbranded, "if in the case of a plant regulator, defoliant, or desiccant when used as directed it shall be injurious to living man or other vertebrate animals, or vegetation to which it is applied, or to the person applying such economic poison: Provided, That physical or physiological effects on plants or parts thereof shall not be deemed to be injury, when this is the purpose for which the plant regulator, defoliant, or desiccant was applied, in accordance with the label claims and recommendations."

7 U.S.C.A. 135a(a) (3) provides: "Any economic poison which contains any substance or substances in quantities highly toxic to man, determined as provided in section 135d of this title, unless the label shall bear, in addition to any other matter required by sections 135–135k of this title—(a) the skull and crossbones; (b) the word 'poison' prominently (IN RED) on a background of distinctly contrasting color; and (c) a statement of an antidote for the economic poison."

The label on the Folex did not contain either the skull and crossbones, the word "poison" (IN RED) or a statement of an antidote for the poison. An official of the defendant company was called and asked for an antidote but he was unable to give one.

■ Even had the defendant not failed to warn the public as it was required to do by both Federal and State law, it is my opinion that the manufacturer of a hazardous material is under a common law duty to make proper tests, give adequate warning and in general protect the public from potential dangers arising out of the manufacture and sale of such hazardous materials. See, Patterson v. Orangeburg Fertilizer Co. et al., 117 S.C. 140, 108 S.E. 401.

In a recent and somewhat similar case, a crop dusting chemical designed to kill plants with broad leaves in rice fields, drifted to cotton fields and damaged the broad leaf cotton. The manufacturer in that case had a published and circulated warning of the risk of damaging cotton and other broad leaf crops, but nevertheless, he was held liable. The basis for that decision was that no sufficient test had been made as to the floating qualities of the dust and that under these circumstances the manufacturer should be held strictly liable for what was regarded as an ultrahazardous enterprise. Chapman Chemical Company v. Taylor, etc., 215 Ark. 630, 222 S.W.2d 820 (1949).

In this case the defendant did not show that it had made sufficient tests to ascer-

tain whether or not Folex was safe to man, and it should be held liable for marketing a product which is poisonous and thus ultrahazardous.

■■ The liability of a manufacturer for injury to a third person, which injury results from the use, in a manner within the reasonable contemplation of the parties, of a manufactured product that is potentially dangerous, is based upon the principle of law that where one person placed in such a position with regard to another that anyone of ordinary sense would know that his failure to use ordinary care and skill might cause injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger. See, McClanahan v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E.2d 712. The defendant did not use care and skill in packaging and warning users of Folex. In South Carolina, the rule is that manufacturers selling an inherently dangerous product may be held liable on the grounds of negligence and plaintiff may be entitled to an action for damages for injury caused by the product. Odom v. Ford Motor Company, 230 S.C. 320, 95 S.E.2d 601 (1956). In the Odom v. Ford Motor Company case, plaintiff was seeking recover under a warranty and failed because South Carolina requires privity. The Court was careful, at pages 326–327, 95 S.E.2d at page 604 to distinguish the requirement of the privity rule with warranties from the exception that there would be liability, not based on the breach of warranty, but upon the view that "the failure of the manufacturer to exercise reasonable care in the making of an article which if negligently made is likely to cause injury to the person using it sounds in tort", and recovery will rest upon negligence.

■ The defendant was negligent in distributing a dangerous poison without adequate tests and without adequate warning of its toxic effects and in failing to publish and/or have available a protective antidote for the toxic substance, and such acts of negligence contributed as a proximate cause to plaintiff's injuries and damages.

■ Proximate cause in the law is not necessarily the proximate cause of the logician, but is determined upon mixed considerations of logic, common sense and experience, policy and precedent. Ballenger v. Southern Worsted Corp. et al., 209 S.C. 463, 40 S.E.2d 681 (1946).

■ Plaintiff was not guilty of contributory negligence.

This Court has jurisdiction of the parties and of the subject matter.

■ It is, therefore, my opinion, that the negligence of the defendant was the proximate cause of plaintiff's injuries and damages and that the plaintiff is entitled to recover actual damages against the defendant in the sum of Forty Thousand ($40,000.00) Dollars, and

It is so ordered.

### On Motion for Amendment of Judgment

The above case is now before me upon motion of the defendant "to move under Rule 59 F.R.C.P. for an Order altering or amending the Judgment entered on 6 March, 1965, in the above captioned action to vacate the same and enter Judgment for the Defendant and for amendment or modification of the Opinion and Order on which such Judgment was based, including amendment of the Findings of Fact as permitted under Rule 52 F.R.C.P., and such further relief as is contemplated under Rule 60 F.R.C.P. and other applicable Federal Rules—including in the alternative a motion for a new trial—to give relief to the Defendant from the Judgment heretofore entered" upon the grounds set forth in the motion.

In compliance with my Order dated March 18, 1965, counsel for defendant has submitted a brief in support of the motion and counsel for plaintiff has likewise submitted a brief in opposition thereto.

This case was tried by me without a jury at Columbia, South Carolina. Because of the complexity of the issues, decision was reserved and oral argument

was had after a copy of the transcript of testimony was available for counsel and the Court. Subsequent to the oral argument and prior to the decision, counsel for both parties submitted comprehensive briefs which were of material assistance in the Findings of Fact, Conclusions of Law, Opinion and Order, filed March 5, 1965. Since much of defendant's motion and argument in support thereof concerns points previously considered and decided adversely to defendant's position, an extended review is not necessary.

Defendant's motion contains twenty-one grounds raising substantially the questions previously advanced in oral and written arguments plus the additional contention that the damages awarded were excessive.

Defendant's chief contention is that there was no evidence that the defendant violated the provisions of the Federal Insecticide, Fungicide and Rodenticide Law (7 U.S.C.A. §§ 135–135k and the South Carolina Economic Poison Law, Section 3–151 through 3–176, Code of Laws of South Carolina, 1962).

Under the applicable provisions of the Act, the defendant owed a statutory duty to the plaintiff and other users of its product to refrain from having the product "misbranded" and to provide certain warning if the substance is "highly toxic to man". The term "misbranded" is defined in Section 135(z) (2) (h) as follows: "If in the case of a plant regulator, defoliant, or desiccant *when used as directed* it shall be injurious to living man or other vertebrate animals, or vegetation to which it is applied, *or to the person applying such economic poison: * * *.*" (Emphasis added).

■ Section 135a(a) (5) prohibits sale or distribution of "Any economic poison which is adulterated or misbranded or any device which is misbranded." As applied to the facts of the instant case, the effect of these two sections is to prohibit the sale or distribution of a defoliant which, if used as directed, causes injury to the person applying it. This statute is in essence a restatement of the basic common law duty owed by the manufacturer or supplier to the ultimate user, i. e., not to furnish a dangerous commodity without adequate warning of the dangers inherent in its use.

The injury to the plaintiff resulted from cholinesterase inhibition following exposure to and inhalation of Folex for three or four days. Cholinesterase inhibition results in the slowing of nerve impulses and a lack of muscular coordination. It is undisputed that the cholinesterase inhibition resulting from exposure to Folex is cumulative.

The defendant's witness Dr. Reese related that tests conducted immediately prior to the trial on monkeys showed that one hour's inhalation of the dust resulted in an inhibition of the cholinesterase activity of 6 to 8% in two of the four monkeys tested. This witness verified that the effects of further inhalation or exposure would be cumulative.

■ The directions on the label specified that application be by "ground or aerial equipment". The caution part of the label stated simply "avoid inhalation of dust and contact with skin, eyes and clothing * * *". There is nothing on the label to warn of the cumulative effects of inhalation or exposure. The original caution label as filed with the Department of Agriculture had the phrase "avoid *prolonged* or *repeated* inhalation of dust * * *" (Emphasis added). The emphasized words were deleted by an agent of the company. Had these words not been deleted, a more adequate warning of the dangers involved to the person using Folex would have been conveyed. Without them, or words of similar, and perhaps stronger, import, the caution label was inadequate and the substance being used as directed was in the words of the statute "injurious * * * to the person applying such economic poison * * *", i. e. plaintiff herein.

The question of whether the defendant complied with Section 135a(a) (3) requiring skull and crossbones and the word "poison" in red on the label as well as an antidote necessarily depends initial-

ly at least on whether the defendant complied with the rules and regulations promulgated by the Secretary of Agriculture as authorized in 135d. These regulations, Title 7 CFR, Sections 362.8, specify the tests which must be performed on animals with the results which determine whether or not the substance is "highly toxic to man". The fact that the defendant obtained "Notice of Registration of Folex by USDA" (Defendant's Exhibit 3) is some evidence that there had been an administrative determination that Folex was not highly toxic within the meaning of the statute and applicable regulations. Whether such determination by the administrative agency is conclusive and not subject to judicial review is not necessary to be decided under the facts of this case. Sufficient to say, there was no competent evidence offered by the defendant showing the results of any tests made on Folex before it was registered with the Federal and State officials. The results of such tests could have shown beyond any question whether or not there was full compliance with the statute and regulations. Placing in evidence the certificate of registration was proof at most only of a technical compliance.

Even if the defendant had been able to show conclusively full compliance with the requirements of the statute, the decision in this case would have been the same because of the clear breach of the common law duty of the defendant to give adequate warning of the dangers inherent in the use of the product as directed or contemplated. The caution label failed to warn plaintiff of the dangerous, cumulative effects of inhalation and exposure thus making defendant liable for plaintiff's injuries and damages.

A similar case is that of Tampa Drug Co. v. Wait, (Fla.) 103 So.2d 603, which is the subject of an annotation in 75 A.L.R.2d 765. The court in that case involving a death from use of carbon tetrachloride observed that the trial "developed into a contest of labels". One of the defendant drug company's defenses was that its label had been approved by the Secretary of Agriculture under the Federal Insecticide, Fungicide and Rodenticide Act. The Court made this comment: "While some might conclude that the notice on the label quoted in the forepart of this opinion would meet the requirements of adequacy, we do not feel that such a conclusion can be reached as a matter of law. The differences in the various labels in evidence of themselves demonstrate that reasonable minds might well differ on the sufficiency of the notice furnished by this label. We think that the sufficiency of the warning to place a reasonable man on notice of the potentially fatal consequences of the commodity here involved and under the conflicting evidence in this record justified submitting the problem to the jury for determination. Similarly whether Mr. Wait exercised reasonable care for his own safety was also a jury issue. In substantial measure the degree of care required of the deceased for his own safety would bear a direct relation to the adequacy of the warning of danger."

Defendant has offered no explanation or real defense to the charge of negligence in failing to have an antidote available at the home office and the seemingly indifferent attitude of the defendant when apprised of the emergency produced by the crash of plaintiff's airplane and the acute shock caused by Folex poisoning. This latter negligence clearly aggravated plaintiff's condition and increased substantially the damages which he sustained.

The question of contributory negligence was argued by counsel prior to the decision and raised again in defendant's motion. There is a complete absence of evidence in the record showing that plaintiff failed to take the normal safety precautions commensurate with the type warning on the label. On the contrary the uncontradicted evidence is that he took all normal safety precautions. Defendant's argument of contributory negligence must fail.

The verdict awarded, while substantial, is certainly not excessive in view of the substantial medical and hospital

bills, pain, suffering, loss of earnings and admittedly serious permanent impairment of plaintiff's person.

After a review of the record, and careful consideration of defendant's motion and supporting argument, I am of the opinion that the motion on all grounds should be and is hereby denied, and

It is so ordered.