In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION.

MDL No. 381.

United States District Court,
E. D. New York.

Nov. 20, 1979.

Victor J. Yannacone, Jr., Yannacone & Yannacone, Patchogue, N. Y., Schlegel & Trafelet, Ltd., L. Steven Platt, Daniel C. Sullivan, Sullivan Associates, Ltd., Chicago, Ill., Hy Mayerson, Spring City, Pa., Dorothy Thompson, Los Angeles, Cal., W. T. McMillan, W. T. McMillan & Co., associated counsel for Australian plaintiffs, Brisbane, Queensland, Australia, Jerry G. Wieslander, Frank G. Wieslander, Altoona, Iowa, Lewis A. Royal, Samuel Zelden, Des Moines, Iowa, David Jaroslawicz, New York City, Newton B. Schwartz, P. C., Benton Musslewhite,

Inc., Houston, Tex., Melvin Block, Brooklyn, N. Y., Marshall A. Bernstein, Bernstein, Bernstein & Harrison, Philadelphia, Pa., Louis B. Merhige, New Orleans, La., Dennis M. O'Malley, Grant & Artesani, Boston, Mass., David C. Anson, Deconcini, McDonald, Brammer, Yetwin & Lacy, Tucson, Ariz., Phillip E. Brown, Hoberg, Finger, Brown, Cox & Molliga, San Francisco, Cal., Leslie Hulnick, Wichita, Kan., Sidney W. Gilreath, Knoxville, Tenn., Stephen J. Cavanaugh, Bellaire, Tex., Robert P. Schuster, Spence, Moriarty & Schuster, Jackson, Wyo., Alton C. Todd, Brown & Todd, Alvin, Tex., Jules B. Olsman, Southfield, Mich., Gerald J. Adler, Crow, Lytle, Gilwee, Donoghue, Adler & Weninger, Sacramento, Cal., Jack E. London, Miami, Fla., David J. Ghilardi, Madison, Wis., Dante Mattioni, Philadelphia, Pa., Elgin L. Crull, Louisville, Ky., Charles J. Traylor, Grand Junction, Colo., Victor L. Marcello, Talbot, Sotile, Carmouche, Waquespack & Marchand, Donaldsonville, La., Janet T. Phillips, Rodgers, Monsley, Woodbury & Berggreen, Las Vegas, Nev., William G. Morgan, William A. Cohan, Denver, Colo., William J. Risner, Tucson, Ariz., James L. Witzel, McKelvey, Cottom & Witzel, East Lansing, Mich., Robert I. P. Pasternak, Jane R. Kaplan, Berkeley, Cal., Norton Frickey, William D. Nelsch, Denver, Colo., Robert C. Huntley, Jr., Racine, Huntley & Olson, Pocatello, Idaho, Jacque B. Pucheu, Pucheu & Pucheu, Eunice, La., Jeffrey M. Stopford, Litvin, Blumberg, Matusow & Young, Philadelphia, Pa., Joseph D. Jamail, Jamail & Kolius, Houston, Tex., Leonard W. Schroeter, J. Kathleen Learned, Schroeter, Goldmark & Bender, P. S., Seattle, Wash., Bennett, DiFilippo, Davison, Henfling & Alessi, East Aurora, N. Y., James A. George, George & George, Baton Rouge, La., James F. Green and Robert A. Taylor, Jr., Ashcraft & Gerel, Washington, D. C., Arden C. McClelland, McClelland Law Offices, Missoula, Mont., Dennis B. Francis, Gillenwater, Whelchel & Nichol, Knoxville, Tenn., Daniel E. Becnel, Jr., Becnel & Faucheux, Reserve, La., Don S. Willner, Willner, Bennett, Bobbitt & Hartman, Portland, Or., John E. Sutter, Peter T. Nicholl, Ashcraft & Gerel, Baltimore, Md., John J. Lowrey, Chicago, Ill., Donald H. Dawson, Harvey, Kruse & Westen, P. C., Detroit, Mich., Jonathan N. Garver, Cleveland, Ohio, Kenneth N. Molberg, Dallas, Tex., Russell L. Cook, Jr., Fisher, Roch & Gallagher, Houston, Tex., Irwin E. Schermer, Schermer, Schwappach, Borkon & Ramstead, Minneapolis, Minn., David D. Noel, Jenkins & Jenkins, Knoxville, Tenn., Thomas E. Allen, Curtis, Crossen, Hensley, Allen, Curtis & Altman, St. Louis, Mo., Phil M. Cartmell, Jr., Gage & Tucker, Kansas City, Mo., Wayne B. Harbarger, III, Littlefield, McDermand & Harbarger, Sacramento, Cal., William T. Jorden, Erie, Pa., Devine & Morris, Atlanta, Ga., Byron N. Fox and Gary K. Hoffman, Brown & Fox, Kansas City, Mo., Ernest L. Caulfield, New Orleans, La., Thomas E. Connolly, Schneider, Reilly, Zabin, Connolly & Costello, P. C., Boston, Mass., Gary W. Anderson, Erler, Taylor & Anderson, Louisville, Ky., Caenen & Niederhauser, Mission, Kan., John T. Golden, Robert F. Stein and William J. Stradley, Stradley, Barnett & Stein, Houston, Tex., Douglass D. Hearne & Associates, Austin, Tex., Lawrence M. Ludwig and Kirby G. Upright, Scranton, Pa., John F. Vecchio, Brenda S. Jenkins, Werner & Rusk, Houston, Tex., Richard R. Ravreby, Ravreby & Connolly, Carlsbad, Cal., Robert A. McNess, III, and Robert W. Knolton, Layton & McNees, P. C., Oak Ridge, Tenn., Henry E. Weil and Ronald S. Canter, Belli, Weil & Jacobs, Rockville, Md., Epstein & Kesselman, Synchef & Synchef, Chicago, Ill., John R. Mitchell and Jay M. Potter, Law Offices of John R. Mitchell, Charleston, W. Va., Richard C. McLean, Denver, Colo., Carlton T. Wynn, Hare, Wynn, Newell & Newton, Birmingham, Ala., Owen J. Bradley, New Orleans, La., for plaintiffs.

Leonard L. Rivkin, Rivkin, Leff & Sherman, Garden City, N. Y., for Dow Chemical.

Morton B. Silberman, Clark, Gagliardi & Miller, White Plains, N. Y., Baker & McKenzie, Chicago, Ill., for Thompson-Hayward.

Wendell B. Alcorn, Jr., Cadwalader, Wickersham & Taft, New York City, for Diamond Shamrock.

Townley & Updike, New York City, for Monsanto.

Joan Bernott, Dept. of Justice, Washington, D. C., for third-party defendant U. S.

Roy L. Reardon, James P. Barrett and Michael V. Corrigan, Simpson, Thacher & Bartlett, New York City, for Ansul Co.

Damien T. Wren, Lewis, Overbeck & Furman, Chicago, Ill., for Riverdale Chemical Co.

Lawrence D. Lenihan, Thomas B. Kinzler and Alfred H. Hemingway, Jr., Arthur, Dry & Kalish, P. C., New York City, for Uniroyal.

Bud G. Holman and William Krohley, Kelley, Drye & Warren, New York City, for Hercules, Inc.

William H. Sanders, William A. Lynch and Paul G. Lane, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for N. A. Phillips.

John M. Fitzpatrick, Dilworth, Paxson, Kalish, Lelvy & Kauffman, Philadelphia, Pa., for Hooker Chemical Co.

Les J. Weinstein, McKenna & Fitting, Los Angeles, Cal., for Occidental Petroleum Co.

GEORGE C. PRATT, District Judge.

Claiming to be the harbinger of thousands of similar claims, plaintiff veterans and members of their families seek relief because of injuries claimed to have been sustained from use by the military in Vietnam of "Agent Orange", a defoliant chemical referred to for convenience as 2, 4, 5–T, which defendants manufactured and sold to the government.

For the second time in the nine month history of this MDL litigation, lead counsel for plaintiffs[1] has filed a re-amended complaint after oral argument on defendants' motion to dismiss a prior amended complaint. While properly criticizing plaintiffs' disregard for the filing requirements of the Federal Rules of Civil Procedure, all de-

fendants indicate, by letter dated October 23, 1979, that they are "prepared to accept service of the TAVC [third amended verified complaint] in *Chapman v. Dow, et al,* * * *." Furthermore, defendants have signed a consent to the TAVC and agreed that:

[T]o avoid further delay arising from the necessity for a new motion addressed to the TAVC, we would ask the Court to deem our motion with respect to the SAVC [second amended verified complaint] as having been made with respect to the TAVC. We do not contemplate, however, that any further briefing will be required with respect to our motion.

Accordingly, defendants' motion to dismiss or strike the SAVC in whole or in part, a motion argued to the court on October 3, 1979, is deemed directed against the TAVC filed October 22, 1979. For reasons set forth below, defendants' motion to dismiss for lack of subject matter jurisdiction is denied, as is defendants' motion to dismiss or strike various allegations of the complaint.

## MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

The TAVC alleges two bases for jurisdiction: (1) the "equitable jurisdiction" of the federal courts; and (2) "federal question" jurisdiction under 28 U.S.C. § 1331.

The first basis is without merit. Federal courts have no independent "equity jurisdiction"; they may grant equitable relief, but not unless there is an independent statutory basis for federal jurisdiction, which is conferred only by specific congressional enactment. *See* 7 Moore, *Federal Practice,* ¶65.03[2.] (1979).

The second basis, federal question jurisdiction under 28 U.S.C. § 1331, is alleged to arise under "the common law and/or the statutory laws of the United States of America." The court will first consider whether a private cause of action may be implied from statutory law, and then will

1. Not intended to be included in the term "plaintiffs" are those in any case filed on or

after October 3, 1979 or in *Kahler v. Dow,* 79 C 922.

turn to plaintiffs' claims under federal common law.

*Implied Causes of Action Under Federal Statutes*

The TAVC lists four statutes "from which a cause of action can be implied": the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. §§ 135–135k; the Federal Environmental Pesticide Control Act (FEPCA), 7 U.S.C. §§ 136–136y; the Toxic Substances Control Act (TOSCA), 15 U.S.C. §§ 2601 *et seq.*; and the Consumer Product Safety Act (CPSA), 15 U.S.C. §§ 2051 *et seq.*

The federal statute regulating herbicides, including defoliants such as 2, 4, 5–T, is FIFRA. Before 1972, FIFRA regulated "economic poisons", which were defined to include: "any substance or mixture of substances intended for use as a plant regulator, defoliant, or dessicant." 7 U.S.C. § 135(a)(2). In 1972, Congress amended FIFRA by enacting the Federal Environmental Pesticide Control Act (FEPCA).[2] FEPCA regulates "pesticides", which are similarly defined to include "any substance or mixture of substances intended for use as a plant regulator, defoliant, or dessicant * * *." 7 U.S.C. § 136(u). Thus, FIFRA, as amended by FEPCA, treats defoliants as "pesticides", which has led the parties to refer to 2, 4, 5–T as a pesticide, and leads the court to do likewise, although common usage would undoubtedly categorize 2, 4, 5–T and other defoliants as herbicides, not pesticides.

Because of FIFRA, the other two statutes under which plaintiffs ask the court to imply a private right of action, TOSCA and CPSA, are inapplicable to this litigation. TOSCA, enacted in 1977, regulates "chemical substances". However, "Such term does not include * * * any pesticide (as defined in the Federal Insecticide, Fungicide, and Rodenticide Act) when manufactured, processed or distributed in commerce for use as a pesticide * * *." 15 U.S.C. § 2602(2)(B)(ii). CPSA, enacted in 1976, regulates, "consumer products". However, "such term does not include * * * pesticides (as defined by the Federal Insecticide, Fungicide, and Rodenticide Act) * * *." 15 U.S.C. § 2052(a)(1)(D). TOSCA and CPSA clearly exclude FIFRA pesticides from coverage. Since FIFRA pesticides include defoliants such as 2, 4, 5–T, TOSCA and CPSA are patently inapplicable to this case.

This leaves plaintiffs with only FIFRA, as amended by FEPCA, on which to base an implied private right of action. Plaintiffs' argument is set forth succinctly in their memorandum opposing defendants' motion to dismiss (plaintiffs' memorandum):

> While federal pesticide legislation [*viz.* FIFRA] does not specifically provide civil remedies for the plaintiff veterans and their families, nevertheless, it is manifest that such laws establish regulatory schemes within the context of which it is intended that a remedy be fashioned by the Courts.
>
> Plaintiffs' memorandum at 22.

Plaintiffs cite no legislative history and offer no detailed statutory interpretation to support their argument, resting instead on the "legislative purpose" and "broad federal policy" said to underlie federal legislation concerned with toxic chemicals.

The test for implying a private cause of action under a federal statute is set forth in the leading case of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975):

> In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," [citation omitted, emphasis supplied by the Supreme Court] that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? [citation omitted]. Third,

---

**2.** Plaintiffs incorrectly treat FEPCA as a statute separate and apart from FIFRA. As stated in the text, FEPCA is an amendment to FIFRA, and thus is properly cited under the statute (FIFRA) which it amends.

is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [citations omitted]. And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088.

■ Here, the plaintiffs qualify under the first part of the *Cort v. Ash* test, as persons meant to be protected by FIFRA. However, plaintiffs fail the next part of the test, since there is clear indication that Congress intended not to allow suits by private citizens under FIFRA:

While it is true that nowhere on the face of the statute is it stated that the enforcement powers of the administrator of the EPA or the Attorney General are or should be exclusive, the legislative history of the statute in question clearly indicates that Congress considered and rejected on more than one occasion proposed amendments which would have provided for citizens' civil actions to enjoin violations. * * *

We recognize that changes in a statute in the course of enactment must be observed with caution in determining legislative intent. However, rejection of specific provisions is in our view more significant, may be properly considered and is more persuasive in the circumstances here found. [citations omitted]. Thus, the Congressional intent to us at least is clear enough: Enforcement of FIFRA is reserved by Congress to the Environmental Protection Agency and to the Office of the Attorney General, and violations thereof are not the proper subject of civil actions by citizens.

*People For Environmental Progress v. Leisz,* 373 F.Supp. 589, 592 (C.D.Cal.1974)

*See also Kelley v. Butz,* 404 F.Supp. 925 (W.D.Mich.1975), upholding the standing of a state attorney general to bring suit under FIFRA, but noting that "the Court is convinced from its review of the authorities that there are significant manifestations of a legislative intent to exclude suits by private citizens under the statute." *Id.* at 940.

Recognizing the force of these cases, plaintiffs would distinguish them away:

Each of these cases was properly brought in the Federal District Court because of its jurisdiction over enforcement of the federal pesticide laws. The fact that the courts denied the plaintiffs therein standing to enforce the provisions of those laws is immaterial here, because in none of these cases was there a claim similar to that brought by the plaintiff veterans and their families in this case. The "Agent Orange" cases are unique on their facts and hopefully, as was the case with thalidomide, not likely to occur again. Plaintiffs' memorandum at 23.

■ Plaintiffs' argument reduces to a claim that the large number of potential claims and the unique circumstances surrounding this litigation justify implying a private cause of action under federal pesticide legislation. But the number of claims and the nature of the injuries, unique as they may be, are not proper factors to be considered under the *Cort v. Ash* test, which focuses on Congressional intent and displacement of state law.

Moreover, under each of the federal pesticide statutes, Congress provided explicitly for suits by the EPA administrator to protect the public interest. The circumstances underlying the instant litigation, involving large numbers of claims arising from widespread exposure to toxic chemicals, seem more likely to generate a suit by public officials, such as the EPA administrator, and thus, if anything, present a less compelling case for implying private causes of action than smaller cases involving fewer plaintiffs and more limited exposure. The court concludes that a private cause of action should not be read into FIFRA, or any other toxic chemical statute, and that plaintiffs' claims asserted thereunder must be dismissed.[3]

---

**3.** *Gonzalez v. Virginia-Carolina Chemical Co.,* 239 F.Supp. 567 (E.D.S.C.1965), a case relied on by plaintiffs, is not to the contrary. *Gonzalez* was a diversity case involving negligence

*Jurisdiction Under Federal Common Law*

Paragraph 3 of the TAVC alleges that "the corporate defendants have violated the common law * * * of the United States * * *." Recognizing that application of federal common law is the exception rather than the rule, plaintiffs' memorandum sets forth in some detail the argument for applying federal common law in this litigation.

According to plaintiffs, the governing standard is that of *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), which according to plaintiffs applies federal common law:

1. Where the question at bar is one arising from or bearing upon a federal program or affecting a federal interest;

2. Where a federal interest would be subjected to uncertainty by application of disparate state rules; or

3. Where federal interests can best be effectuated by the adoption of a uniform federal rule.

Plaintiffs' memorandum at 8.

To satisfy the first prong of the *Clearfield* standard, plaintiffs, relying on *United States v. Standard Oil Co.*, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947), argue that:

Since the claims of the plaintiff veterans and their families arise out of the defendants' activities in that significant federal enterprise known as the Viet Nam war, it is hard to conceive of any claim which more clearly involves substantial federal interest and which more clearly satisfies the jurisdiction requirement of 28 USC § 1331(a).

Plaintiffs' memorandum at 9–10.

Plaintiffs note that the outcome of this litigation may affect claims for "service-related" benefits from the Veterans Administration. Plaintiffs add that federal interests are implicated because "the corporate defendants acted as war contractors to the U.S. government pursuant to federal procurement laws administered by the Department of Defense." Plaintiffs' memorandum at 10.

To satisfy the second prong of the *Clearfield* standard, plaintiffs note that the states have different statutes of limitations, and different rules governing liability for defective products, differences which might "lead to contrary and even contradictory results among the individual cases", a result deemed "intolerable" by *Clearfield*. Plaintiffs' memorandum at 13.

To satisfy the third and final prong of the *Clearfield* standard, plaintiffs list various questions presented by this litigation which should, they say, be governed by a uniform federal rule:

How are soldiers of the United States to be compensated for toxic torts inflicted by multi-national conglomerate corporations? How are principles of "fitness" and "safety" to be applied to the paraphernalia of the battle field? In the absence of statutory direction, how are the policies enunciated in federal pesticide and toxic substances legislation to be effectuated?

Plaintiffs' memorandum at 15.

According to plaintiffs, each of these questions implicates federal interests, and should be answered under uniform federal standards.

Defendants disagree. To begin, defendants dispute the applicability of *Clearfield*, which sets forth the standard for applying federal common law only when the United States is a party to the litigation. Here, the government is not a party, and defendants insist that the governing rule is supplied instead by other cases, such as *Miree v. DeKalb County*, 433 U.S. 25, 97 S.Ct. 2490, 58 L.Ed.2d 557 (1977) and *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966).

claims against a pesticide manufacturer. The *Gonzalez* court held that defendant, by failing to attach proper labels, had violated the terms of FIFRA, and thus was negligent *per se* under South Carolina law. *Gonzalez* did not suggest, much less hold, that plaintiff had a cause of action directly under FIFRA, itself, which would independently support federal jurisdiction.

Defendants further contend that, even if *Clearfield* governs, plaintiffs fail to meet any of its three standards. First, according to defendants, "no federal interest will be impaired by the application of state law to what are, in essence, claims for personal injury." Defendants' reply memorandum at 2. Although the litigation does involve soldiers and war contractors,

> Claims for personal injury by American servicemen against manufacturers that allegedly harmed them by selling defective products to the military have, in the past, been governed by state law. *See e. g., Whitaker v. Harvell-Kilgore Corp.,* 418 F.2d 1010 (5th Cir. 1969); *Boeing Airplane Co. v. Brown,* 291 F.2d 310 (9th Cir. 1961); *Adams v. General Dynamics Corp.,* 405 F.Supp. 1020 (N.D.Cal.1975), *affirmed,* 535 F.2d 489 (9th Cir. 1976). *Id.* at 3.

As for the alleged federal interest in compensating injured soldiers, defendants urge that "there already exists a statutory scheme that is designed to accomplish just this result. *See* 38 U.S.C. §§ 310 *et seq.*" *Id.* at 3–4. And the rights and liabilities of the United States, itself, are not directly involved in this litigation, since plaintiffs "have chosen not to bring this action against the United States." *Id.* at 4. Thus, according to defendants, plaintiffs have failed to carry their burden of showing a substantial federal interest involved in this litigation.

Furthermore, according to defendants, plaintiffs fail to show that this litigation will affect "a federal program" concerned with regulation of toxic substances. Even if disparate state laws were applied, "differing judgments rendered on plaintiffs' damage claims because of supposedly differing state tort laws [footnote omitted] will simply have no effect upon the outcome of the EPA's administration of the present version of FIFRA." Defendants' reply memorandum at 7.

Finally, defendants argue that the failure of plaintiffs to show how this litigation would impair a federal interest or a federal program disposes of the second and third branches of the *Clearfield* test, since no federal interest "would be subjected to uncertainty by application of disparate state rules" or would "best be effectuated by the adoption of a uniform federal rule." Thus, defendants urge, plaintiffs have failed in every respect to justify application of federal common law to this litigation.

■ There is merit to many of defendants' contentions. The test for applying federal common law in suits between private parties is that of *Miree* and *Wallis,* not *Clearfield* ; under *Miree* and *Wallis,* suits by soldiers against war contractors do not necessarily implicate federal programs or substantial federal interests; and the federal interest in compensating soldiers for service-related injuries is the object of an existing statutory scheme, 38 U.S.C. §§ 310 *et seq.* However, for reasons discussed below, the court concludes that this litigation does, nonetheless, affect substantial federal interests, and that federal common law must be applied.

Analysis must begin with *Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 58 L.Ed.2d 557 (1977), in which the Supreme Court explained the limited grounds for applying federal common law in a suit between private parties. *Miree* was a diversity suit with plaintiffs seeking recovery under state law as third party beneficiaries to a contract between defendant and the Federal Aviation Administration (FAA). After its panel applied state law, the Fifth Circuit *en banc* reversed, finding that a third party beneficiary's right to sue should be determined under federal common law. The Supreme Court reversed once again, concluding that state law, not federal common law, applied.

Writing for the Court, Mr. Justice Rehnquist began by noting that the United States was not a party to the suit, and that "the resolution of petitioner's breach of contract claim against respondent will have no direct effect upon the United States or its treasury." 433 U.S. at 29, 97 S.Ct. at 2494. For this reason, the solicitor general waived his right to participate in the appeal.

Not only was there no direct federal financial interest, but there was also no federal program threatened by the litigation:

The operations of the United States in connection with FAA grants such as these are undoubtedly of considerable magnitude. However, we see no reason for concluding that these operations would be burdened or subjected to uncertainty by variant state-law interpretations *regarding* whether those with whom the United States contracts might be sued by third-party beneficiaries to the contracts. Since only the rights of private litigants are at issue here, we find the *Clearfield* trust rationale inapplicable.

*Id.* at 30, 97 S.Ct. at 2494.

The court quoted from an earlier case, *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966), which had discussed "the nature of a federal interest sufficient to bring forth the application of federal common law":

In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a *significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown.* It is by no means enough that, as we may assume, Congress could under the Constitution readily enact a complete code of law governing transactions in federal mineral leases among private parties. Whether latent federal power should be exercised to displace state law is primarily a decision for Congress.

*Miree*, 433 U.S. at 31–32, 97 S.Ct. at 2495 (emphasis added by the Supreme Court).

The *Miree* court concluded that with respect to an airplane crash caused by birds flying over a dump established near an airport in violation of an agreement with the Federal Aviation Administration, there was no significant conflict between federal policy and state law, and that "any federal interest in the outcome of the question before us 'is far too speculative, far too remote a possibility to justify the application of federal law to transactions essentially of local concern.' [citation omitted]". *Id.* at 32–33, 97 S.Ct. at 2495.

Scrutiny of *Miree* reveals several different formulations of the standard that governs application of federal common law in a suit between private parties having "no direct effect upon the United States or its treasury". Federal common law might be applied when federal programs or operations "would be burdened or subjected to uncertainty by variant state-law interpretations", 433 U.S. at 30, 97 S.Ct. at 2494; or when there is "a significant conflict between some federal policy or interest and the use of state law in the premises", *id.* at 31, 97 S.Ct. at 2495, quoting *Wallis*; or when "substantial rights or duties of the United States hinge on [the suit's] outcome." *Id.* And in his concurrence, Chief Justice Burger suggests that federal common law might be applied:

where the rights and obligations of private parties are so dependent on a specific exercise of Congressional regulatory power that "the Constitution or acts of Congress 'require' otherwise than that state law govern of its own force." [citation omitted].

Once it has been determined that it would be inappropriate to apply state law and that federal law must govern, "the inevitable incompleteness presented by all legislation means that interstitial federal law making is a basic responsibility of the federal courts." [citation omitted].

*Id.* at 34–35, 97 S.Ct. at 2496.

Thus, *Miree* formulates in various ways the standard that governs application of federal common law. One point, however, is clear: federal common law is to be the exception not the rule, and the question of "whether to displace state law * * * is primarily a decision for Congress." *Id.* at 32, 97 S.Ct. at 2495.

Analyzing the law after *Miree*, the Fifth Circuit has provided a helpful synthesis of the principles governing application of federal common law developed in Supreme Court cases:

Together these cases produce a balancing test. *See generally* Comment, "Adopting

State Law As The Federal Rule of Decision: A Proposed Test," 43 U.Chi.L.Rev. 799 (1976). On one side is the federal interest in carrying out a program in the most efficient and effective manner possible. On the other is a state's interest in the preservation of its control over local interests, particularly traditional interests such as family law and real property transactions, and in preventing displacement of state law. Of course, the ultimate goal of the creation of federal law by the courts is to carry out the federal program in question. [citations omitted]. Thus, if state law would actually frustrate rather than only hinder a federal program, federal common law *must* be applied regardless of state interests [citation omitted]. On the other hand, the Supreme Court has demonstrated a growing desire to minimize displacement of state law. *See Miree v. DeKalb County,* [*supra*].

*Georgia Power Co. v. 54.20 Acres of Land,* 563 F.2d 1178, 1189 (CA5), *cert. denied* 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979).

■ As is clear from the Fifth Circuit's analysis and from the Supreme Court cases discussed above, courts have not yet developed a precise standard to govern application of federal common law in suits between private parties. However, the precedents and the parties seem to agree that at least three factors are crucial to applicability of federal common law under any test: (1) the existence of a substantial federal interest in the outcome of a litigation; (2) the effect on this federal interest should state law be applied; and (3) the effect on state interests should state law be displaced by federal common law. Accordingly, the court will consider how each of these factors might affect the application of federal common law in this litigation.

### Federal Interests

There are substantial federal interests at stake in these lawsuits. As pointed out in

*United States v. Standard Oil Co.,* 332 U.S. 301, 305–306, 67 S.Ct. 1604, 1607, 91 L.Ed. 2067 (1947):

Perhaps no relation between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces. To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces and persons outside them or non-federal governmental agencies, the scope, nature, legal incidence and consequences of the relation between persons in service and the government are fundamentally derived from federal sources and governed by federal authority [citations omitted]. So also we think are interferences with that relationship such as the facts of this case involve. For, as the Federal Government has the exclusive power to establish and define the relationship by virtue of its military and other powers [footnote omitted] equally clearly it has power in execution of the same functions to protect the relation once formed from harms inflicted by others. [footnote omitted].

■ Soldiers serving in the armed forces are government charges, entitled to government protection. Torts committed by war contractors against soldiers in action constitute "harms inflicted" on the soldiers and "interference" with the relationship between soldiers and the government. Such harms and interferences implicate federal interests identified in *Standard Oil.*

■ Defendants argue that 38 U.S.C. § 310 *et seq.* gives sufficient federal protection to veterans injured in active service. However, 38 U.S.C. § 310 *et seq.,* insofar as it may apply,[4] furnishes limited monthly benefits which may not fully compensate plaintiffs for the serious injuries alleged in the complaint. Nor does 38 U.S.C. § 310 *et seq.* provide compensation to veterans' spouses, or their children who are alleged to

---

**4.** 38 U.S.C. § 310 *et seq.* compensates for service-related injuries. Whether Agent Orange injuries are service-related appears to be the subject of separate litigation. *White v. Cleland,* Civil Action No. 79–1426 (DDC, filed May 31, 1979).

have suffered genetic damage due to defendants' activities. The limited nature of compensation provided by 38 U.S.C. § 310 *et seq.* makes it an insufficient guardian of the rights at stake in this litigation, *viz.* the rights of soldiers to be protected from "harms inflicted by others" and to be compensated for harms already inflicted. The existence and extent of these contested rights necessarily are intertwined with the relationship between government and soldier and thereby implicate federal interests.

Nor is the federal interest in this litigation confined to the rights of soldiers; it includes as well the rights of the war contractors. The government has an interest in the liability of war contractors to soldiers, since the extent of a contractor's liability may, undoubtedly will, affect future dealings between the contractor and the government. In *Miree*, the Supreme Court discounted the effect that third-party suits might have on relations between the FAA and its contractors:

> [W]e see no reason for concluding that these operations would be burdened or subjected to uncertainty by variant state-law interpretations regarding whether those with whom the United States contracts might be sued by third-party beneficiaries to the contracts.

433 U.S. at 30, 97 S.Ct. at 2494.

However, suits by civilian third-party beneficiaries to FAA contracts with municipalities for injuries received in a private plane crash are quite different from product liability suits by soldiers against government war contractors for injuries received while serving in the armed forces. FAA relations with municipalities would be only slightly disrupted by sporadic third party suits seeking to enforce diverse contractual provisions. In contrast, government relations with war contractors might well be drastically altered by changes in the rules governing liability of war contractors to soldiers for injuries caused by inherently "dangerous" war materials.[5]

This does not mean that there is a *substantial* federal interest in every product liability suit brought by a veteran against a government war contractor. A lone veteran suing the supplier of a single piece of defective military machinery would implicate only a minimal federal interest. Such were the facts in *Whitaker v. Harvell-Kilgore Corp., supra; Boeing Airplane Co. v. Brown, supra;* and *Adams v. General Dynamics Corp., supra,* cases cited by defendants in each of which state law was applied to a tort claim brought by a veteran against the supplier of explosives or airplanes. But this litigation, in contrast, involves suits by many veterans against five war contractors who supplied a product used for some nine years in military operations across large portions of Vietnam. The estimated number of involved veterans ranges from thousands to millions, and the estimated potential liability of the five war contractors ranges from millions to billions of dollars. As the number of veterans and the size of the claims against the war contractors in-

---

5. Speculative federal interests in the obligations of war contractors are numerous. War contractors might be expected to increase the price of war materials to correspond to any extension in their potential liability. Such adjustments might have a significant effect on the federal treasury. If potential liability increased dramatically, future war contractors might attach conditions to the use of their products, or balk at supplying the military with any products whatsoever. Thus, the government's military capabilities might be affected by this litigation. Finally, the importance of large government war contractors to the national economy might implicate a federal interest. Defendants are five of the nation's largest chemical manufacturers, facing aggregate claims which may eventually amount to billions of dollars. Defendants note that:

> plaintiffs do not have the temerity to argue that the aggregate claims of the purported class exceed the total assets of the five named defendants. Such an argument would be ludicrous on its face.
>
> *Dow's Memorandum in Opposition to Class Certification* at 20.

But, with such large corporations, the sudden onset of substantial liabilities, even if they fell far short of defendants' total assets, might well affect federal interests, as shown by the recent events involving the federal government and the Chrysler Corporation.

crease so the federal interest in this litigation expands.[6]

*Effect on Federal Interests Should State Law Be Applied*

■ If this litigation were governed by state law, different state laws would be applied to essentially similar claims by Vietnam veterans and their families against the five defendant war contractors. As plaintiffs' remark,

> There is, of course, no uniformity of product liability law throughout the 50 states absent this Court's application of the federal common law. Were the corporate defendants to have their way, each of the plaintiffs would be relegated to some local notion of "products liability". Necessarily, this would lead to contrary and even contradictory results among the individual cases. In the end, a granting of defendants' Motion would lead to the spectre of young servicemen who fought a difficult war shoulder-to-shoulder and who were exposed to virtually identical risks coming home to widely varying systems of compensation for their injuries under different systems of jurisprudence and before disparate forums. Such a result was deemed intolerable in *Clearfield Trust Co. v. United States* and in *United States v. Standard Oil Co.* and it should be deemed intolerable in the "Agent Orange" cases.

Plaintiffs' memorandum at 13.

Application of varying state laws would burden federal interests by creating uncertainty as to the rights of both veterans and war contractors. It would also be unfair in that essentially similar claims, involving veterans and war contractors identically situated in all relevant respects, would be treated differently under different state laws. An extreme example would be the application of different state statutes of limitation to claims by veterans who were injured together in Vietnam, but who lived in different states before or after service. The court concludes that application of state law in this litigation would burden substantial federal interests.[7]

*Effect on State Interests Should State Law Be Displaced By Federal Common Law*

As noted by the Fifth Circuit in *Georgia Power Co. v. 54.20 Acres of Land, supra,* 563 F.2d at 1189, "[T]he Supreme Court has demonstrated a growing desire to minimize displacement of state law." This desire is evident in *Miree v. DeKalb, supra,* 433 U.S. at 32, where the Supreme Court emphasized that "the issue of whether to displace state law on an issue such as this is primarily a decision for Congress." The courts have been especially reluctant to apply federal common law to matters of essentially local concern that are usually governed by well-developed principles of state law. Tort claims are traditionally matters for state law, which has developed comprehensive substantive and procedural rules to govern them. According to defendants, it would be improper to hold in this litigation "that state law be displaced by an unprecedented federal common law of products liability * * *." Defendants' reply memorandum at 2.

But negligence and strict product liability claims in this litigation do not fall under the

---

**6.** The number of veterans and the size of their claims involved in this litigation implicate substantial federal interests in the rights of the veterans. However, the unprecedented number and size of the claims also suggest more speculative, but nonetheless vital, federal interests. The number of veterans potentially involved in this litigation may suffice to raise broad questions about the conduct of military operations which a single veteran plaintiff might not have standing to raise. The resolution, and indeed the cognizability, of such questions implicate significant federal interests, to say the least.

**7.** It might also be argued that unequal treatment of plaintiff veterans implicates peculiarly federal interests, and unequal treatment of any person, of course, raises questions of justice to which federal courts are sensitive. Presumably, state courts are equally sensitive to claims of inequality and unfairness, but their viewpoints are localized, not national. However, it is the identity of the parties (veterans and war contractors), not merely their numbers, which makes equality of treatment a peculiarly federal concern in this litigation.

developed body of state tort law.[8] State tort law has not yet evolved rules to govern the duties of federal war contractors to federal soldiers. True, state law has been occasionally applied to claims by veterans against war contractors. *Whitaker v. Harvell-Kilgore Corp., Boeing Airplane Co. v. Brown,* and *Adams v. General Dynamics Corp., supra.* But those suits were by individual soldiers and dealt with claims of manufacturing defects in airplanes and explosives, objects whose misuse is frequently regulated by state tort law. In contrast, this litigation involves defoliants and other toxic chemicals, whose use and misuse is increasingly governed by federal law; comprehensive federal legislation has in large part taken these products out of the domain of state regulation; injuries to large numbers of veterans are claimed to have been incurred while overseas in a combat area; and the injuries themselves are claimed to be an inevitable consequence of the federal government's use of defendants' products.

In sum, state law has not considered the complex question of a war contractor's liability to soldiers injured by toxic chemicals subject to federal regulation while engaged in combat and serving abroad. Because state law is no more or less developed as to such claims than federal common law, application of federal common law thereto would not significantly displace state law.

It appears, then, that there are significant federal interests in this litigation, that the application here of varying state laws would impair these federal interests, and that application of federal common law would not significantly displace state law. This showing justifies application of federal common law under even the strictest reading of the sometimes enigmatic language of *Miree* and *Wallis.* If, as defendants insist, application of federal common law to mass tort claims is unprecedented, the reason may be that no tort claim has heretofore

implicated such significant federal interests involving so many persons in an area so little regulated by state law. This court is satisfied that there is ample justification for application of federal common law to this litigation.

## MOTION TO DISMISS OR STRIKE VARIOUS ALLEGATIONS

■ Defendants move to strike certain claims for relief asserted in the TAVC. Defendants argue that the claims for various forms of declaratory relief and for creation of a trust fund seek relief unavailable from a federal court under current federal law. It may well be that this or any other court ultimately will grant none of the requested relief. However, defendants are not prejudiced by allowing these requests for relief to remain in the TAVC, since defendants have no obligation to admit or deny plaintiffs' requests for relief, which therefore place no pleading burden on defendants. Accordingly, defendants' motion to strike these requests for relief is denied.

Defendants' motion to strike allegations regarding phenoxy herbicides and the corporate history of the defendants is moot, since such allegations have been omitted from the TAVC.

## CONCLUSION

■ Defendants' motion to dismiss or strike the SAVC in whole or in part is deemed, on consent, to be directed against the TAVC. The claims in the TAVC alleged to arise, by implication, under FIFRA, FEPCA, TOSCA, and CPSA are dismissed, and defendants need not respond to paragraph 4 of the TAVC. The claims in the TAVC alleged under federal common law are held to state a claim on which relief can be granted, and to provide a basis for

---

**8.** The TAVC alleges causes of action not only in negligence and strict product liability, but under theories of breach of warranty, intentional tort, equity, and nuisance. Because the focus of the litigation appears to be negligence and strict product liability, only these claims have been considered for application of federal common law. At this point, it is unnecessary to decide whether the other claims should be governed by federal common law, or rather should be treated as pendent state law claims.

federal jurisdiction under 28 U.S.C. § 1331.[9] Accordingly, defendants' motion to dismiss for lack of subject matter jurisdiction is denied, as is defendants' motion to strike or dismiss various allegations of the TAVC.

Defendants shall serve and file their answers to the TAVC, which is deemed to be the complaint in *Chapman v. Dow*, 79 C 1195, no later than 20 days from the date of this memorandum. All parties shall appear for a pretrial conference on Friday, December 21, 1979 at 9:30 a. m. The agenda for this conference shall include (1) a new timetable for resolution of plaintiffs' motion for class certification, and (2) a timetable for discovery on the merits. Any party may suggest other items for the agenda by letter to the court served and filed no later than Friday, December 14, 1979.

SO ORDERED.

---

**9.** The parties, without arguing the point, seem to assume that application of federal common law provides a sufficient basis for federal question jurisdiction under 28 U.S.C. § 1331. This assumption is confirmed by *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). See Wright, *Federal Courts* (3d Ed) at 68.